[L.A. No. 29975. In Bank. July 24, 1972.]

SOUTHERN CALIFORNIA EDISON CO., Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

[L.A. No. 29976. In Bank. July 24, 1972.]

SAN DIEGO GAS & ELECTRIC CO., Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

(Consolidated Cases.)

## COUNSEL

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendant and Appellant.

John G. Wigmore, Lawler, Felix & Hall, Bruce M. Casey, Leslie P. Jay and Chickering & Gregory for Plaintiffs and Respondents.

## OPINION

**TOBRINER, J.**—In these consolidated actions instituted in 1966, plaintiffs Southern California Edison Company (Edison) and San Diego Gas and Electric Company (San Diego G & E) seek a partial refund of sales and use taxes paid by the utilities on purchases of various electrical equipment over the period January 1, 1956, to December 31, 1959. Although plaintiffs concede that the taxes which they initially paid in the late 1950's were accurately computed with respect to the original, agreed-upon sales prices of the equipment in question, the utilities contend that as a result of substantial payments of "voluntary price adjustments" made to them by the sellers of the electrical equipment in 1964 and 1965—in settlement of the utilities' antitrust actions charging the sellers with a price-fixing conspiracy —the sales and use taxes paid to the state in the 1950's became improperly inflated. Plaintiffs claim that they are now entitled to a re-computation of their sales and use tax liability for the 1956-1959 period based upon the lower, "adjusted" sales prices of their 1956-1959 purchases. In the instant litigation, the utilities accordingly seek reimbursement of sales and use taxes paid on that portion of the original sales prices subsequently returned to them by the sellers of the equipment, a total tax refund exceeding $325,000.[1]

---

[1]Edison claims a total refund of $278,413.98; San Diego G & E seeks a refund of $53,037.06. All of Edison's claim and the bulk of San Diego G & E's claim involve the refund of state use taxes; San Diego G & E's prayer includes a sum of $10,336.56 relating to an alleged overpayment of state sales tax.

The instant cases involve primarily claims for use tax refunds, rather than sales tax refunds, because of the interstate nature of most of the underlying transactions. Although most of the manufacturers of electrical equipment are retailers engaged in business in California, whose sales to a California utility would normally be subject to sales tax, apparently most of the underlying sales in the instant case involved direct shipment to the California purchaser from plants or warehouses located outside of the state. The interstate character of such sales exempts them from sales

The present case thus presents the novel question of whether a sales or use tax refund is available when, subsequent to a sale and payment of the appropriate tax, the parties to the sale agree to a downward "adjustment" of the initial sales price as part of a settlement of litigation arising out of the seller's alleged illegal price-fixing activity. The trial court, reasoning that it would be "unconscionable" to permit the state to retain—at the expense of the innocent utilities—"inflated" sales and use taxes collected on the basis of excessively high, "price-fixed" prices, concluded that plaintiffs should be repaid the full tax refunds sought. Accordingly the court entered judgments in the utilities' favor.

Defendant State Board of Equalization appeals from these judgments, contending primarily that the sought refunds are not available because they are not authorized by any provision of the Sales and Use Tax Act. Further, defendant urges that the denial of a tax refund does not unconscionably burden the innocent victim of a price-fixing conspiracy, since under the federal Clayton Act the antitrust violator, rather than the victim, must properly bear any loss flowing from an antitrust violation.

For the reasons discussed more fully below, we agree with defendant's contentions and conclude that the judgments in favor of plaintiffs must be reversed. First, the payments received by the utilities in settlement of their antitrust claims, though termed "voluntary price adjustments" by the parties to the agreement, do not differ in any realistic sense from any other damages paid by a seller to a buyer as a result of a seller's wrongful actions in the conduct of the sales transaction. Traditionally, the courts have not regarded such "damages" as altering the "sales price" of the original transaction, and we find nothing in the present statutory scheme to suggest that the Legislature intended such payments to support a "readjustment" of the initial sales or use tax. Indeed, we conclude that the present statutory provisions negate such an interpretation.

Second, we believe that the allowance of a tax refund under these circumstances would, in general, produce the undesirable and inequitable effect of shifting one cost of a price-fixing conspiracy from the perpetrators of the conspiracy to the taxpayers of the state. To deter violations of the federal antitrust laws, the Clayton Act contemplates that violators of the act be held trebly liable for *all* damages resulting from any illegal activity. Since higher sales and use taxes are a direct and foreseeable consequence of any price-fixing scheme, such "inflated" taxes, resulting from higher

---

tax, and consequently subjects the purchasers to the compensating use tax. (See Rev. & Tax. Code, § 6401; see generally Traynor, *The California Use Tax* (1936) 24 Cal.L.Rev. 175.)

prices simply compose one element of the damages which the conspirators should bear. Plaintiffs have failed to demonstrate any justification for requiring the state, rather than the conspirators, to shoulder the "excessive" tax burden flowing from the price-fixing conspiracy.

The undisputed factual background of the present litigation is set out at some length in stipulated statements of facts submitted in both cases. In essence, the stipulations reveal that the instant tax refund actions are one aftermath of the highly publicized, nationwide electrical manufacturers' price-fixing conspiracy which first came to light early in 1960 through criminal indictments returned by a federal grand jury against most of the country's major electrical manufacturing companies. As a result of the grand jury's actions, federal authorities instituted criminal prosecutions under section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), charging some 30 companies and 46 individuals with conspiring to fix prices, to rig bids and to allocate markets with respect to more than 20 separate categories of electrical equiment. In February 1961, all of the numerous defendants entered pleas of guilty or nolo contendere to the charged antitrust violations; the federal court imposed fines upon the companies and sentenced several individual defendants to short prison terms.

Following these criminal convictions, major purchasers of electrical equipment across the country filed scores of civil antitrust actions against electrical manufacturers, seeking, pursuant to section 4 of the Clayton Act,[2] to recover treble damages for all injuries arising from the manufacturers' widespread conspiratorial activities. Plaintiffs Edison and San Diego G & E were among the many large investor-owned public utility companies which brought such suits against a large number of the electrical manufacturers. Edison and San Diego G & E each joined more than a dozen companies as defendants to their actions; both utilities, however, sought the greatest share of the recovery from their largest suppliers, General Electric and Westinghouse.

In response to the deluge of civil antitrust suits filed against them across the country, the electrical manufacturers—with General Electric taking the lead—instituted negotiations with the numerous complaining utility companies in an effort to reach a settlement of the massive litigation. After

---

[2]Section 4 of the Clayton Act (15 U.S.C. § 15) provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

more than a year of negotiation, these discussions eventually succeeded in producing nationwide and industry-wide settlements of all pending actions. By September 1965, Edison and San Diego G & E had executed separate agreements with each of the suppliers against whom they had initiated treble damage actions.

Although individual settlement agreements varied in minor detail, the substance of all the agreements was identical. Each manufacturer agreed to pay to the complaining utility a sum of money equal to the total of two distinct categories of damages: the first category was designated "voluntary price adjustments," the second, "reimbursement for out-of-pocket expenses." It is the former category—the so-called "voluntary price adjustment" payment—which is directly relevant to the instant litigation.

Under the agreements, the parties computed the "voluntary price adjustment" figure by multiplying a utility's purchases from a given supplier during the calendar years 1956 through 1959 by agreed-upon percentages. The percentage formula was not identical for all categories of purchases: in the case of a large number of smaller, not readily identifiable items purchased within a particular category of equipment, the parties determined the percentages by multiplying the aggregate billing prices of the disparate purchases within the category by a single percentage figure; in the case of large, identifiable pieces of equipment, such as turbine-generators, the amount of the "adjustment" percentage was separately negotiated. In all cases the percentage formula was applied to a billing price which did not include sales or use tax.

In consideration for the substantial payments provided by these adjustment formulas,[3] plaintiffs Edison and San Diego G & E agreed to dismiss all pending treble damage actions and to execute "covenant[s] not to sue" with respect to the alleged antitrust conspiracy. Thus, taken as a whole, the agreements effected a complete and final settlement of any claims that the utilities may have had against their suppliers under federal or state antitrust laws. The parties have stipulated that both Edison and San Diego G & E on the one hand, and their electrical suppliers on the other, have fully performed all terms of the settlement agreements.

On April 8, 1966, plaintiff Edison filed a claim with the defendant Board of Equalization seeking, as a result of its "voluntary price adjustment" receipts, a partial refund of sales and use taxes which had been

---

[3]According to the utilities' own pleadings, Edison received in excess of $10.8 million, and San Diego G & E in excess of $1.6 million, in "voluntary price adjustment" payments.

paid to the state on the utility's purchase of electrical equipment from January 1, 1956, to December 31, 1959;[4] San Diego G & E filed a similar claim with the board on September 29, 1966. (See Rev. & Tax. Code, §§ 6901, 6904.) In these claims for refund, the utilities alleged that by virtue of the antitrust settlement agreements, the sales prices of purchases made from 1956 to 1959 had been adjusted downward; inasmuch as sales and use tax liability flows from the "sales price," the utilities contended that their earlier tax liabilities should correspondingly be reduced. In other words, Edison and San Diego G & E claimed that because they had previously paid sales and use taxes on the basis of sales prices that were now erroneously high, the utilities should now receive a refund of that portion of their original tax payments attributable to those amounts subsequently "refunded" to them by their suppliers.

After the board had failed to act favorably on their claims for refund for over six months, plaintiffs instituted the present actions pursuant to Revenue and Taxation Code section 6934.[5] In light of the similarity of the legal questions at issue, the two suits were consolidated for trial. On the basis of the foregoing stipulated facts, and several additional, less vital, stipulations,[6] the trial court ruled in favor of both utilities and entered judgments for the full amount of the refunds sought.

 Defendant board appeals from these judgments, asserting that no provision of the California Sales and Use Tax Act authorizes either a

[4]A portion of the payments made to Edison in 1964 and 1965 by the electrical manufacturers was in settlement of suits initiated by California Electric Power Co., a corporation which had merged with Edison late in 1963. In like manner, some of the purchases on which Edison now seeks a tax refund were originally made by the California Electric Power Co.

[5]Section 6934 provides: "If the board fails to mail notice of action on any claim within six months after the claim is filed, the claimant may, prior to the mailing of notice by the board of its action on the claim, consider the claim disallowed and bring an action against the board on the grounds set forth in the claim for the recovery of the whole or any part of the amount claimed as an overpayment."

Unless otherwise indicated, all section references are to the Revenue and Taxation Code.

[6]The additional stipulations consisted of (1) two sworn statements by the plaintiff utilities' top officials and (2) several rulings rendered by the United States Internal Revenue Service on the proper income tax treatment to be accorded the antitrust settlement agreements. The officials' statements declared only that in the officials' personal opinion the amount received by the utilities in the settlement agreements was less than the actual amount of the original overcharges resulting from the price-fixing conspiracy; the officials explained that the utilities' acceptance of such a settlement "was prompted by . . . the ultimate desire to avoid the possibility of a permanent dislocation of the electrical equipment industry upon which the utilities depend." The substance of the revenue ruling is discussed briefly at footnote 12, *infra*.

deduction or a refund on the basis of an "adjustment" of sales price arranged in settlement of litigation, and contending that the trial court accordingly erred in awarding plaintiffs any tax refund under the circumstances.[7] As noted above, we have concluded that, as defendant suggests, under the controlling legislative provisions a subsequent "adjustment" of a purchased item's "sales price" as part of a settlement of litigation does not entitle a taxpayer to a refund of any portion of the initially computed sales or use tax.

We turn first to the governing statutory provisions.[8] Sections 6011 and 6012 of the Revenue and Taxation Code generally define the terms "sales price" and "gross receipts"—the figures upon which use and sales taxes are imposed (Rev. & Tax. Code, §§ 6201, 6051)—as "the total amount for which tangible personal property is sold or leased or rented . . . without any deduction on account of . . . (1) [t]he cost of the property sold, (2) [t]he cost of material used, labor or service cost, interest charged, losses or any other expenses [or] (3) [t]he cost of transportation of the property. . . ." Both sections thereafter contain a long series of items specifically excluded from the "sales price" or "gross receipt" concept,[9] but neither section includes any provision authorizing either a

[7]In addition to this broad challenge to the fundamental premise of the trial court's decision, defendant mounts three alternative attacks on the judgments. First, the board asserts that even if plaintiffs are entitled to a refund based on an *actual* adjustment in sales prices, the refund in the instant case cannot be measured by the total "voluntary price adjustment" figure, because that figure, arrived at in settlement of *treble* damage actions, inevitably contains an element of punitive damages in addition to an actual refund on sales prices. Second, defendant contends that the instant claims are barred by the governing statute of limitations contained in Revenue and Taxation Code section 6902, since they were not filed within six months of the execution of the settlement agreements. Finally, the board asserts that San Diego G & E, as the ultimate consumer but not the legal taxpayer of the alleged *sales* tax overcharges, lacks standing to obtain a sales tax refund.

In view of our conclusion that defendant's primary attack on the trial court's decision is meritorious and requires reversal, we find it unnecessary to reach any of these additional contentions.

[8]Preliminarily we note that "[s]ince this question involves the applicability of a statute to a given situation presented on stipulated and uncontradicted facts, [the issue presented] is a question of law [citation]. Upon this record, we are not bound by the findings below in our determination of the question." (*Peterson Tractor Co.* v. *State Board of Equalization* (1962) 199 Cal.App.2d 662, 668 [18 Cal.Rptr. 800].)

[9]Section 6011, subdivision (c) provides in full:

" 'Sales price' does not include any of the following:

"(1) Cash discounts allowed and taken on sales.

"(2) The amount charged for property returned by customers when that entire amount is refunded either in cash or credit, but this exclusion shall not apply in any instance when the customer, in order to obtain the refund, is required to purchase other property at a price greater than the amount charged for the property

deduction or exclusion from the original sales price for a subsequent "adjustment" of the sales price. ■ As we only recently reiterated in *Great Western Financial Corp.* v. *Franchise Tax Board* (1971) 4 Cal.3d 1, 5-6 [92 Cal.Rptr. 489, 479 P.2d 993], as a general rule in tax matters "[d]eductions may be allowed or withheld by the Legislature as it sees fit," and the defendant board argues that since no code section provides for a deduction or a refund under the instant circumstances, the trial court erred in ordering such a refund.

■ Plaintiff utilities point out, in response, that although no specific statutory provision may explicitly authorize a refund in the instant situation,[10] the statutory definition of "sales price" and "gross receipts" do not

---

that is returned. For the purpose of this section refund or credit of the entire amount shall be deemed to be given when the purchase price less rehandling and restocking costs are refunded or credited to the customer.

"(3) The amount charged for labor or services rendered in installing or applying the property sold.

"(4) The amount of any tax (not including, however, any manufacturers' or importers' excise tax) imposed by the United States upon or with respect to retail sales whether imposed upon the retailer or the consumer.

"(5) The amount of any tax imposed by any city, county, city and county, or rapid transit district within the State of California upon or with respect to retail sales of tangible personal property, measured by a stated percentage of sales price or gross receipts, whether imposed upon the retailer or the consumer.

"(6) The amount of any tax imposed by any city, county, city and county, or rapid transit district within the State of California with respect to the storage, use or other consumption in such city, county, city and county, or rapid transit district of tangible personal property measured by a stated percentage of sales price or purchase price, whether such tax is imposed upon the retailer or the consumer.

"(7) Separately stated charges for transportation from the retailer's place of business or other point from which shipment is made directly to the purchaser, but the exclusion shall not exceed a reasonable charge for transportation by facilities of the retailer or the cost to the retailer of transportation by other than facilities of the retailer; provided, that if the transportation is by facilities of the retailer, or the property is sold for a delivered price, this exclusion shall be applicable solely with respect to transportation which occurs after the purchase of the property is made.

"(8) The amount of any motor vehicle fee or tax imposed by and paid the State of California that has been added to or is measured by a stated percentage of the sales or purchase price of a motor vehicle."

Section 6012, subdivision (c) excludes the identical 8 items from the section's definition of "gross receipts."

[10]Although plaintiffs do not contend that any statutory provision specifically provides for a tax refund in "sales price adjustment" cases, the utilities do maintain that section 6901 "authorizes" the board to make the claimed refund in the instant case. Section 6901 provides in relevant part: "If the board determines that any amount . . . has been paid more than once or has been *erroneously or illegally collected or computed,* the board shall set forth that fact . . . and shall certify to the State Board of Control the amount collected in excess of the amount legally due and the person from whom it was collected or by whom paid. If approved by

specifically refer to the "original" or "initial" sales price or gross receipts of a purchase, and hence that it would be more "realistic" to interpret the statutory language as permitting a "readjustment" of the taxable sales price or gross receipts whenever the parties to a sale subsequently modify the terms of their agreement.

An overall view of the sales and use tax statutory scheme, however, indicates that the Legislature intended the "sales price" and "gross receipts" terminology of sections 6011 and 6012 to refer to the *price agreed upon at the initial sales transaction* and not to the net amount which the buyer ultimately pays for the goods purchased. Thus, for example, sections 6055 and 6203.5 specifically authorize the taxpayer to deduct "worthless accounts" from the sales price and gross receipt figures referred to in sections 6011 and 6012. Sections 6011 and 6012 themselves each contain a subdivision directing the exclusion of certain "returned goods" from the sections' definitions of "sales price" or "gross receipts" (§ 6011, subd. (c)(2); § 6012, subd. (c)(2)). If the definition of "sales price" and "gross receipts" referred only to that amount which the seller *ultimately* received on the sale, as plaintiffs suggest, these various sections and subdivisions apparently would be superfluous.[11]

Thus, the broad terms of the statute preclude the recovery of any part of the sales or use taxes paid by plaintiff both because the section does not provide for the sought deduction or refund and further because the

the State Board of Control the excess amount collected or paid shall be credited by the board on any amount then due and payable . . . and the balance shall be refunded. . . ." (Italics added.) Plaintiffs argue that this section, in itself, gives the board authority to determine that their initial sales and use taxes were "erroneously or illegally collected."

Section 6901 is merely a procedural provision, however, and does not in itself provide standards for determining whether a given tax has been "erroneously or illegally" paid. The determination of error or illegality in the collection of the tax can only be made on the basis of the substantive sales and use tax provisions set out in the earlier sections of the statutory scheme. Under the utilities' proposed interpretation of section 6901, the board would exercise a virtually unlimited power to determine the legality or illegality of tax payments. We cannot read so broad or arbitrary a power into the clearly procedural terms of the provision.

[11]Plaintiffs seek to gain support from the various exclusions and deductions permitted for such items as "worthless accounts" and "returned goods" by arguing that such provisions demonstrate the "feasibility" of adjusting the initial sales price computation in light of subsequent events. The crucial difference between these "adjustments" and the one plaintiffs seek, however, is that the former "adjustments" have been specifically authorized by the Legislature, whereas the latter has not. (Cf. *Hawley* v. *Johnson* (1943) 58 Cal.App.2d 232, 237 [136 P.2d 638] (statute permitting exclusion of "cash discounts" from sales price does not authorize exclusion of non-cash discounts).)

statute indicates that the Legislature in referring to "sales price" and "gross receipts" meant to designate the price actually reached by the parties at the initial sales transaction rather than a fictitious "adjusted" price later conceived by the parties. (Cf. *Hawley* v. *Johnson* (1943) 58 Cal.App.2d 232, 237 [136 P.2d 638].) Plaintiffs argue that such an interpretation is unduly rigid, and implies that *any* subsequent sales price "adjustment"— even simply to correct a clerical error—could not alter the sales or use tax liability. The instant litigation, however, does not require us to determine the effect of such a clerical "adjustment" upon sales or use tax liability; the case at bar presents only the narrow issue of whether a purported "voluntary sales price adjustment" *arrived at in settlement of antitrust litigation* entitles a taxpayer to a sales and use tax refund measured by the so-called "inflated" portion of the original sales price. With respect to this issue, we hold that California's current Use and Sales Tax Law sanctions no such refund.

■ Although the settlement agreements negotiated between the electrical manufacturers and the plaintiff utilities refer to the major portion of the payments to the utilities as "voluntary price adjustments," our case law specifies that in sales and use tax matters the language utilized by the parties to characterize their transactions does not, in itself, necessarily control. (See, e.g., *Peterson Tractor Co.* v. *State Board of Equalization* (1962) 199 Cal.App.2d 662, 669 [18 Cal.Rptr. 800].) ■ We can discern no relevant distinction between the payments in the instant case and any other payment which might be received by a purchaser of goods from the seller as a result of litigation arising out of the sales transaction. Thus, any recovery—by way of settlement or judgment—obtained, for example, in a buyer's action for misrepresentation or breach of warranty could as appropriately as the instant payment be termed a "price adjustment," for after the recovery of such damages the product which the plaintiff purchased has not "cost" him the full original "sales price."

Such "damages" paid as a result of a seller's wrongful conduct, however, have never in common parlance been considered a reduction of the "sales price" of the original purchase[12] and in the absence of some specific statu-

---

[12]In support of their characterization of the refund payments as adjustments of their purchases' "sales price," plaintiffs rely on several income tax rulings of federal and state authorities which permit the utilities to treat such payments as a return of capital, resulting in a lower tax base for the equipment involved, rather than as ordinary income (see, e.g., Internal Revenue Service's Technical Information Release (TIR-919) (1967)); plaintiffs suggest that this treatment demonstrates that the payments were "actually" reductions in the items' "sales price." Defendant, on the other hand, counters this suggestion by citing yet another federal tax ruling,

tory indication, we cannot assume the Legislature intended to adopt such an unorthodox meaning of "sales price" for purposes of the state use tax. The utilities expect that by a metaphysical figuring of "price," they can work a downward "adjustment" of the actual payment and thereby get a reduction of the sales and use tax. In truth, however, the utilities reached a sum in settlement of an antitrust suit; the "adjusted" price, an entirely fictitious figure, can hardly justify the return of taxes based upon actual sales prices properly collected by the state.

In parallel fashion payments made by a seller to a buyer in settlement of litigation have never been treated as a reduction of the "gross receipts" which the seller obtained on the initial sale. Indeed, section 6012, subdivision (a)(2) specifically provides that the "gross receipts," which serve as the basis of the state sales tax should *not* be reduced by "[t]he cost of materials, labor or service cost, interest paid, losses, *or any other expense*" (italics added). Since the "price adjustment" payments in the instant case are, at most, simply business litigation expenses, the Legislature has clearly indicated that no reduction in sales or use tax liability should be afforded on the basis of this type of "sales price adjustment" payment.[13] Plaintiffs, who bear the burden of establishing their entitlement to a tax refund in this action (cf. *People* v. *Schwartz* (1947) 31 Cal.2d 59, 63, 64 [187

which declares that the electrical manufacturers' payments are to be treated by such manufacturers as "ordinary business expenses" (see Rev. Rul. 64-225 (1964)) rather than as a retroactive reduction of prior years' gross receipts.

The conflicting inferences that may be drawn from these disparate income tax rulings reveal quite clearly that the characterization of certain payments as, for example, a "return of capital," "ordinary income" or "ordinary business expenses" for purposes of the income tax laws is neither controlling, nor even particularly helpful, in the present sales and use tax context. Under the income tax laws, taxpayers are frequently permitted to structure their transactions so as to elect from a variety of possible tax treatments, an option not so liberally afforded by our sales and use tax provisions; moreover, in the income tax field, the tax has traditionally been imposed on a "net" figure, whereas sales and use tax are explicitly computed on the basis of the "gross" concepts of "sales price" and "gross receipts." In view of these significant distinctions we conclude that plaintiffs' reliance on the proffered income tax rulings is misplaced.

[13]Both the parallel statutory sections (compare Rev. & Tax. Code, § 6011 with Rev. & Tax. Code, § 6012 and Rev. & Tax. Code, § 6051 with Rev. & Tax. Code, § 6201) and the clear legislative purpose of the provisions (see Traynor, *The California Use Tax* (1936) 24 Cal.L.Rev. 175) demonstrate that "gross receipts" and "sales price" are complementary concepts, intended to equalize as fully as practicable the sales and use tax liability on parallel in-state and out-of-state transactions. Under the provisions of section 6012 discussed above, amounts paid as antitrust settlements by a California defendant with respect to California transactions would clearly not be excludable from the measure of "gross receipts" for purposes of the state sales tax; thus, similar payments made with respect to out-of-state transactions cannot reasonably be held to reduce the comparable "sales price" computation for purposes of the state use tax.

P.2d 12]), have cited no authority which even remotely supports the granting of a sales or use tax refund on the basis of a "price adjustment" reached in settlement of a civil action.

Nor can we accept plaintiffs' final argument that the state's retention of the taxes imposed on the illegally fixed prices would be "unconscionable." The utilities reason that if the electrical manufacturers had not engaged in their price-fixing scheme, the initial sales prices of the purchased electrical equipment would have been lower and the state would have obtained less sales and use taxes. Plaintiffs argue strenuously that the state should not be permitted to retain the fruits of the illegal price-fixing conspiracy to the detriment of the nonculpable victims of the scheme.

The denial of a tax refund under these circumstances will not, however, require all price-fixing "victims" personally to sustain the losses flowing from "inflated" sales and use taxes, as plaintiffs suggest. In all cases any increased sales or use tax liability arising from fixed prices will be a direct and proximate result of the antitrust violator's illegal activities, and, as such will be recoverable from the wrongdoing conspirator in a civil action. Indeed, under section 4 of the Clayton Act (see fn. 2, *supra*) the injured purchaser is entitled to recover treble damages for any excessive tax liability occasioned by an unlawful antitrust scheme. In view of the plaintiffs' legal right to obtain more than full recovery from the primary participants in the price-fixing conspiracy, their present claim of unconscionability is untenable.[14]

The utilities respond, however, that in the instant case their settlements with the electrical manufacturers did not *in fact* include this sales or use tax recovery, and thus that they should be entitled to recover these taxes from the state. The utilities observe that the potential liability of the electrical manufacturers under the pending antitrust suits was so great as to threaten a permanent "dislocation" of the industry, and the utilities explain that in light of their substantial "dependency" upon their suppliers, they could not, in their settlement negotiations, insist on full payment of all the manufacturers owed under the antitrust laws. Although we do not doubt

---

[14]At oral argument plaintiffs suggested that the excess sales and use tax liability might not be recoverable as damages from the antitrust conspirators because the conspirators had not retained the excess taxes but had paid them to the state. Under section 4 of the Clayton Act, however, the measure of plaintiffs' recovery is the amount of damages sustained by the antitrust victim, not the amount improperly obtained by the conspirator. (See, e.g., *Story Parchment Co.* v. *Patterson Co.* (1931) 282 U.S. 555, 566-567 [75 L.Ed. 544, 550, 51 S.Ct. 248]; *Lessig* v. *Tidewater Oil Co.* (9th Cir. 1964) 327 F.2d 459, 464.)

that plaintiffs' decision to forego some of the damages to which they were legally entitled may well have been quite reasonable from the standpoint of the utilities' own self-interest, we cannot understand how this explanation can justify requiring the *state* to assume the burden of damages which the utilities declined to collect from the alleged conspirators.

Indeed, we believe that if plaintiffs were successful in obtaining the tax refund sought in the present case, higher sales and use taxes arising from illegal antitrust activity would, as a practical matter, be shifted from the antitrust violators to the taxpayers of the state in most cases. To deter potential antitrust violations, section 4 of the Clayton Act provides that conspirators are liable for treble the amount of *all* damages caused by their illegal activity; since higher sales and use taxes are a direct and foreseeable consequence of illegally inflated prices, to permit an antitrust "victim" to recover these damages in a tax refund action from the state instead of from the wrongdoer would not only unfairly burden the state but would also reduce some of the intended deterrent effect of the Clayton Act. We find nothing in our Sales and Use Tax Act which would warrant such a result.

In sum, the utilities proclaim that they "expressly refrained from obtaining all of the amounts that they had been overcharged—much less such overcharges trebled." They state that the electrical equipment manufacturers and the utilities "each needed the other"; hence the utilities consummated this "relatively modest plan" of disposition of their claims. The utilities assert that because of these mutual needs of manufacturers and buyers, they did not fully pursue their remedy of damages and did not attempt to collect sales and use taxes which they now contend should be borne by the public. Yet the self-interest of the utilities hardly justifies their foisting upon the public the expense of sales and use taxes that they properly had paid. If we are to talk in terms of conscionability, we doubt the justification of the utilities' demand that the *public* shoulder expenses that the criminal conspiracy caused to them but that they failed to obtain from the wrongdoer. The utilities' hypothesis of the ex post facto "sales price adjustment" now offered to sustain their sought return of the sales and use taxes, in our opinion, melts as quickly in the searing light of propriety as the wax that held together the wings of Icarus.

The judgments for plaintiffs are reversed.

Wright, C. J., McComb, J., Peters, J., Burke, J., and Sullivan, J., concurred.

The petition of respondent Southern California Edison Co. for a rehearing was denied August 23, 1972.