LAKE AND PENINSULA BOROUGH,
Appellant,

v.

NORQUEST SEAFOODS, INC.,
and Lafayette Fisheries,
Inc., Appellees.

Lake and Peninsula Borough, Appellant,

v.

Louie Alakayak, Wassillie Andrews, Peter
Chernishoff, Agnes Hansen, Jerry L. Hatton and Christine Monroe, Appellees.

No. S–9679.

Supreme Court of Alaska.

Feb. 1, 2002.

William B. Oberly, Law Office of William
B. Oberly, Anchorage, for Appellant.

Patrick B. Gilmore, Atkinson, Conway &
Gagnon, Anchorage, for Appellees Norquest
Seafoods, Inc. and Lafayette Fisheries, Inc.

Phillip Paul Weidner and Wayne D. Hawn,
Weidner & Associates, Inc., Anchorage, for
Appellees Alakayak, Andrews, Chernishoff,
Hansen, Hatton and Monroe.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

The Lake and Peninsula Borough appeals
a superior court order reversing the borough's assessment of sales tax on funds paid
by fish processors to settle an antitrust class
action by commercial salmon fishers. Because the circumstances of the litigation and
settlement do not support the borough's
characterization of the processors' payment
as a post-season adjustment of the contractual price paid for salmon, we affirm the superior court.

## II. FACTS

Louie Alakayak and other Bristol Bay fishers (collectively "fishers") filed a class action
lawsuit against numerous fish processors in
1995, alleging that the processors violated
Alaska antitrust laws by conspiring to set
below-market prices for sockeye salmon.
The class of plaintiffs numbered more than
5,500 and encompassed all commercial drift
and set gill net permit holders in the Bristol

Bay salmon fishery who participated in the seasons of 1990–95, including those fishing and selling salmon in the Lake and Peninsula Borough.

The borough initially decided to participate in the lawsuit by signing an agreement with a fishers' attorney, Bruce Stanford, "advanc[ing] $25,000 dollars towards the costs of [the] proposed litigation as 'seed money' at the rate of return of 4 to 1." As a part of the agreement, Stanford pledged to "use his best good faith effort to see to it that the Borough receives its 2% sales and use taxes on all Bristol Bay salmon harvested within its jurisdictional boundaries from any settlement and/or judgement that the fishermen receive by way of the proposed antitrust litigation." After reconsidering the agreement and determining that it was probably illegal, the borough rescinded its agreement and demanded that Stanford return the money. Stanford agreed to return the money.

In 1997 the fishers reached a settlement with two of the defendants, Norquest Seafoods, Inc., and Lafayette Fisheries, Inc. As a part of the settlement, Norquest and Lafayette agreed to pay the fishers $2,000,000. Norquest and Lafayette (the processors) specifically disclaimed any wrongdoing in the settlement and cited "the burdens, expenses and uncertainties of continuing litigation" as the motivation for the settlement.

The borough determined that the settlement proceeds were subject to its tax on sales of raw fish, and it sent a "Notice of Tax Lien" to the lead plaintiffs' counsel and the counsel for the processors. The fishers and the processors filed written protests to the tax lien. Borough Manager Walt Wrede issued a decision in which he denied the tax protests and upheld the lien. Wrede wrote in his ruling that the fishers' antitrust claims were based on the underpayment for fish sold in the borough, and therefore the settlement was a post-season adjustment of the original sales price. The fishers and pro-

cessors believed Wrede's ruling wrong and appealed the decision to superior court.

Superior Court Judge Peter A. Michalski ruled that the tax liens were premature. Judge Michalski subsequently ruled that the settlement was not a taxable sales event. The borough appeals.

## III. DISCUSSION

### A. Standard of Review

 We use our independent judgment in reviewing the decision of a superior court sitting as an intermediate court of appeal.[1] In interpreting municipal ordinances, we use our independent judgment[2] and will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[3]

### B. The Settlement of Antitrust Litigation Was Not a Taxable Event.

 The borough argues that the funds the processors paid to the fishers to settle the antitrust litigation are a "post-season adjustment" to the sales price and as such are taxable under the sales tax ordinances. The borough urges us to look to the fishers' underlying antitrust claims to characterize the settlement funds as an adjustment "in lieu of underpayment for the fish when originally purchased." (Emphasis omitted.) Relying on a series of federal income tax cases that classify settlement proceeds for tax purposes based on the nature of the underlying claims, the borough argues that the settlement funds should be taxable. The fishers and processors dispute the characterization of the settlement as a post-season adjustment.

We begin by reviewing the borough's sales tax ordinances. The borough taxes all sales of raw fish within the borough.[4] Its ordinances define a sale as occurring when:

[A] person within the borough becomes directly or indirectly obligated for the payment for the sale of property . . . and, if the sale is of raw fish, without regard to whether delivery by the seller occurred

---

**1.** See *Schikora v. State, Dep't of Revenue,* 7 P.3d 938, 941 (Alaska 2000).

**2.** See *Balough v. Fairbanks N. Star Borough,* 995 P.2d 245, 254 (Alaska 2000).

**3.** *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**4.** Lake & Peninsula Borough Code (LPBC) § 6.40.020 & .030(D).

directly or indirectly nor whether delivery of the fish occurred inside or outside the Borough.... [5]

The sales price is defined as:

[T]he total consideration, whether money, credit, rights or other property, paid, delivered or given by the buyer, expressed in terms of money.... *In the case of raw fish, sale price includes* ... post purchase or post season adjustments or bonuses.[6]

The only construction of the tax ordinance that would support taxing the settlement funds would be to characterize those funds as a post-season adjustment or bonus. But we disagree with the borough's assertion that the settlement proceeds can be characterized as a taxable adjustment to the sales price.

First, the settlement money is not compensating the fishers for underpayment on specific sales of fish.[7] Instead the fishers are being compensated for economic losses incurred because of the alleged conspiracy of the processors to set artificially low prices. Any loss to the fishers in such a price-fixing suit can only be characterized as resulting from market manipulation, not transactional manipulation. And the remedy that the fishers claim is statutorily prescribed compensation in place of lost revenues, not contractual adjustments for individual sales.

In contrast, the inclusion of a post-season adjustment within the sales tax ordinance's definition of sales price is transaction specific. The definition does not, for example, assess sales tax against the total value of a fisher's season sales based upon an average price received for sales occurring throughout the fishing season. Instead, assessments are based upon each contractual transaction between a fisher and a processor-buyer. Simply because the tax includes post-season adjustments within its definition of sales price

does not change the transaction-specific nature of the tax. Because of the contrast between the transaction-specific sales tax and the nature of the damages sought, we will not characterize the settlement as a taxable post-season adjustment.

Second, it is inaccurate to characterize the processors' settlement payment as compensation for losses in specific transactions because the competitive practices statutes do not premise liability on completed transactions between the injured party and the offending party.[8] The statutes only require that the offending party commit anti-competitive conduct to incur liability to the injured party.[9] Thus, the cause of action for economic loss under AS 45.50.576 does not correspond to any particular sales transactions and is considerably broader than one for simple breach of contract for underpayment.

Moreover, the settlement funds at issue here encompass a broad range of possible commercial conduct and economic effects occurring wholly outside the borough's borders. For example, the class of fishers covered by the settlement may include many who did not fish within the borough and therefore engaged in no locally taxable transactions at all during the fishing seasons. And the settlement funds will resolve claims accusing the processors of anti-competitive conduct that could have occurred virtually anywhere and that allegedly lowered salmon prices not just inside the borough, but throughout the Bristol Bay area.

At bottom, then, because neither the basic allegations of the antitrust action nor the actual provisions of the disputed settlement correspond to any particular sale, or set of sales, within the borough, we find no permissible basis here for characterizing the settlement money as a post-season adjustment to

---

5. LPBC § 6.40.010(G).

6. LPBC § 6.40.010(H) (emphasis added).

7. We assume here, for purposes of this argument, that it is appropriate to characterize the settlement as compensation instead of a payment in avoidance of litigation expenses or as partially punitive in nature, as the fishers and processors argue.

8. AS 45.50.562 defines combinations in restraint of trade: "Every contract, ... or conspiracy, in restraint of trade or commerce is unlawful." AS 45.50.576(a) creates the individual cause of action for violations of AS 45.50.562: "A person who is injured in business or property by a violation of AS 45.50.562–45.50.570, ... may bring a civil action ... for damages sustained by the person."

9. *See* AS 45.50.562.

taxable sales. Because the processors' liability stemmed not from conduct tied to contracting for purchases of fish, but from alleged economic conduct occurring outside the context of taxable sales transactions within the borough, we will not characterize the settlement money as a post-season adjustment of such transactions.

We are aware of only one published opinion that speaks to the issue of whether a settlement agreement in litigation modifies the original sales price of a commodity for purposes of a sales tax. In that case, *Southern California Edison Co. v. State Board of Equalization*, the court held that there was no such modification.[10] There, Edison paid sales tax on the purchase of electrical equipment but later sued the suppliers of the equipment, alleging a price-fixing conspiracy.[11] After the suppliers settled the antitrust case by agreeing to "voluntary price adjustments," Edison sought a refund on sales tax from the state.[12] The court rejected Edison's characterization of the settlement as a downward adjustment of the original sales price:

> [T]he payments received by the utilities in settlement of their antitrust claims, though termed "voluntary price adjustments" by the parties to the agreement, do not differ in any realistic sense from any other damages paid by a seller to a buyer as a result of a seller's wrongful actions in the conduct of the sales transaction. Traditionally, the courts have not regarded such "damages" as altering the "sales price" of the original transaction, and we find nothing in the present statutory scheme to suggest that the Legislature intended such payments to support a "readjustment" of the initial sales or use tax.[13]

The court also noted a general policy for rejecting such a refund:

> [W]e believe that the allowance of a tax refund under these circumstances would, in general, produce the undesirable and inequitable effect of shifting one cost of a price-fixing conspiracy from the perpetrators of the conspiracy to the taxpayers of the state.[14]

While each party to this case contends that *Edison* supports its position, the borough's arguments are less persuasive. And the borough's tax ordinances do not seem to support its construction of the sales tax as applying to the settlement proceeds.

We note that our holding does not leave the borough or other local taxing authorities without a remedy when anti-competitive behavior deprives them of sales tax revenue as a result of artificially low prices. Alaska Statute 45.50.576(b) provides boroughs, cities, and the state with a cause of action for damages resulting from violations of Alaska's competitive practices statutes.[15] In this case, the borough could have joined the fishers' antitrust lawsuit, or filed its own action against the processors for sales taxes lost due to the alleged conspiracy to set artificially low prices.

For each of these reasons, we hold that the settlement money is not taxable under the borough's sales tax.

## C. Estoppel

The borough argues that the fishers should be estopped from denying the applicability of the sales tax because one of the fishers' attorneys agreed to "use his best good faith effort to see to it the Borough receives its 2% sale[s] and use taxes" in exchange for $25,000 in "seed money" early in the litigation. But the borough misunderstands the defense of promissory estoppel. It is entirely unclear how the borough could have reasonably relied on—or been prejudiced by—"best efforts" promises made by an individual attorney in the context of an apparently unlawful "seed money" arrangement that the borough subsequently rescinded. Yet, even assuming that the borough could estop the fishers from arguing that the sales tax was inapplicable, it

---

10. 7 Cal.3d 652, 102 Cal.Rptr. 766, 498 P.2d 1014 (1972).

11. *Id.* 102 Cal.Rptr. 766, 498 P.2d at 1015.

12. *Id.*

13. *Id.* 102 Cal.Rptr. 766, 498 P.2d at 1016.

14. *Id.*

15. *See* AS 45.50.576(b).

could hardly estop the processors from advancing the same argument, for the processors were not a party to the disputed agreement.[16] Therefore, the borough's argument is without merit.

## IV. CONCLUSION

The decision of the superior court is AFFIRMED.

**16.** *See Mortvedt v. State, Dep't of Natural Resources,* 858 P.2d 1140, 1143 n. 7 (Alaska 1993).