[No. S136070. Aug. 21, 2006.]

ANGELA ANN BERNARD et al., Plaintiffs and Appellants, v.
JAMES FOLEY, as Trustee, etc., Defendant and Respondent.

## COUNSEL

Robert M. Neubauer for Plaintiffs and Appellants.

Mark T. Eagan and Donna Bader for Defendant and Respondent.

## OPINION

**WERDEGAR, J.**—In this case we determine whether close personal friends of a dependent elder who at the end of her life provided her with personal care, including health care, are "care custodians" for the purposes of statutory provisions that presumptively disqualify care custodians as beneficiaries of testamentary transfers from dependent adults to whom they provide such services. (Prob. Code, §§ 21350, 21351, subd. (d) (hereafter section 21351(d)); Welf. & Inst. Code, § 15610.17, subd. (y).)[1]

We conclude that when an unrelated person renders substantial, ongoing health services to a dependent adult, that person may be a care custodian for purposes of the statutory scheme at issue, notwithstanding that the service relationship between the individuals arose out of a preexisting personal friendship rather than a professional or occupational connection. Accordingly, we affirm the judgment of the Court of Appeal.

---

[1] Unlabeled section references are to the Probate Code.

## Background

On August 28, 1991, decedent Carmel L. Bosco executed the Carmel L. Bosco Revocable Living Trust (Trust). Over the years, decedent amended the Trust seven times. Plaintiffs, relatives of decedent, brought this action seeking to invalidate the seventh, and final, amendment.

Decedent, a widow with no children, was close to her extended family. Plaintiff Angela Ann Bernard is a niece, Ann Cassell is decedent's sister, Arthur G. Erman and Benny Tumminello are nephews, and Cathy Lee Miller is a nephew's successor in interest. Defendant James Foley is the successor trustee of the Trust. Foley and his girlfriend, Ann Erman (hereafter Erman), were longtime personal friends of decedent. For two months before her death, decedent resided at the Riverside home shared by Foley and Erman, who jointly cared for her during her final illness.

Three days before she died, decedent executed the seventh amendment to the Trust, pursuant to which Foley and Erman each became a 50 percent residuary beneficiary. Neither had been named as a beneficiary in earlier versions of the Trust.

Plaintiffs petitioned the court to invalidate the seventh amendment to the Trust and for a determination of beneficial interests in the Trust estate. They alleged that: (1) decedent was dependent on Foley and Erman, inter alia, for custodial care, from approximately July 15, 2001, until her death; (2) the seventh amendment was the product of undue influence by Foley and Erman; (3) decedent lacked testamentary capacity when she executed the seventh amendment because she was gravely ill and heavily sedated; and (4) Foley and Erman were disqualified to receive a testamentary transfer from decedent because they had been her "care custodians" within the meaning of section 21350, subdivision (a)(6) and did not fall within any exception to that statute.

A bench trial was held at which various witnesses testified, including Foley, Erman and some of the plaintiffs. The parties disputed whether Erman or Foley had received payment for the room, board and services they provided to decedent. Foley and Erman denied they had; Foley in his brief to this court asserts that in any event they "certainly were not under a duty" to take care of decedent. "They were simply performing acts of kindness on a purely volunteer basis as good friends often do for others." The trial court noted that "Ann Erman had a personal relationship with decedent founded on a familial bond,"[2] ruling that, although there was some evidence of compensation to Erman relating to expenses for decedent's care, the evidence was

---

[2] Ann Erman formerly was married to decedent's nephew, plaintiff Arthur Erman.

insufficient to establish a "business relationship." The trial court denied plaintiffs' petition, concluding neither Erman nor Foley were care custodians.

The Court of Appeal reversed, holding that Foley and Erman were "care custodians" of decedent and they had failed to rebut the statutory presumption that decedent's donative transfer to them was procured by undue influence. The Court of Appeal remanded the cause with directions that the trial court enter a new judgment invalidating the seventh amendment to the Trust. We granted Foley's petition for review.

### *Discussion*

### A. *Statutory Disqualification of Care Custodians*

■ Part 3.5 of division 11 of the Probate Code (hereafter part 3.5), section 21350 et seq., sets forth certain limitations on donative transfers by testamentary instrument.[3] Section 21350 lists seven categories of persons who cannot validly be recipients of such donative transfers, including, inter alia, "[a] care custodian of a dependent adult who is the transferor" (*id.*, subd. (a)(6)). The statute provides that the term "care custodian" for these purposes "has the meaning as set forth in Section 15610.17 of the Welfare and Institutions Code." (§ 21350, subd. (c).)[4] That section, in turn, defines "care custodian" by means of a list of described agencies and persons, concluding in its final

---

[3] " 'Instrument' means a will, trust, deed, or other writing that designates a beneficiary or makes a donative transfer of property." (§ 45.)

[4] In its entirety, section 21350 provides that, "(a) Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] (1) The person who drafted the instrument. [¶] (2) A person who is related by blood or marriage to, is a domestic partner of, is a cohabitant with, or is an employee of, the person who drafted the instrument. [¶] (3) Any partner or shareholder of any law partnership or law corporation in which the person described in paragraph (1) has an ownership interest, and any employee of that law partnership or law corporation. [¶] (4) Any person who has a fiduciary relationship with the transferor, including, but not limited to, a conservator or trustee, who transcribes the instrument or causes it to be transcribed. [¶] (5) A person who is related by blood or marriage to, is a domestic partner of, is a cohabitant with, or is an employee of a person who is described in paragraph (4). [¶] (6) A care custodian of a dependent adult who is the transferor. [¶] (7) A person who is related by blood or marriage to, is a domestic partner of, is a cohabitant with, or is an employee of, a person who is described in paragraph (6).

"(b) For purposes of this section, 'a person who is related by blood or marriage' to a person means all of the following: [¶] (1) The person's spouse or predeceased spouse. [¶] (2) Relatives within the third degree of the person and of the person's spouse. [¶] (3) The spouse of any person described in paragraph (2). [¶] In determining any relationship under this subdivision, Sections 6406 [Relatives of Halfblood], 6407 [Unborn Relatives of Decedent], and Chapter 2 [Parent and Child Relationship] (commencing with Section 6450) of Part 2 of Division 6 shall be applicable.

"(c) For purposes of this section, the term 'dependent adult' has the meaning as set forth in Section 15610.23 of the Welfare and Institutions Code and also includes those persons who

subdivision with "[a]ny other . . . agency or person providing health services or social services to elders or dependent adults."[5] (Welf. & Inst. Code, § 15610.17, subd. (y).)

■ Section 21351 sets forth several exceptions to section 21350. Relevant for our purposes is subdivision (d) of section 21351, which provides that the prohibition of section 21350 does not apply if "[t]he court determines, upon clear and convincing evidence, but not based solely upon the testimony of any person described in subdivision (a) of Section 21350 [i.e., any prohibited transferee], that the transfer was not the product of fraud, menace, duress, or undue influence."

Once it is determined that a person is prohibited under section 21350 from receiving a transfer, "section 21351 creates a rebuttable presumption that the transfer was the product of fraud, duress, menace, or undue influence. A person who is prohibited from receiving a transfer under section 21350 may still inherit, if [he or she] successfully rebuts the section 21351 presumption (§ 21351, subd. (d)). In order to rebut the presumption, the transferee must present clear and convincing evidence, which does not include his or her own testimony, that the transfer was not the product of fraud, duress, menace, or undue influence. (§ 21351, subd. (d).)" (*Estate of Shinkle* (2002) 97 Cal.App.4th 990, 993 [119 Cal.Rptr.2d 42].)

■ As we previously have observed, this statutory scheme supplements the common law doctrine that "a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark* (2002) 28 Cal.4th 89, 97 [120 Cal.Rptr.2d 522, 47 P.3d 300]; see also *Graham v. Lenzi* (1995) 37 Cal.App.4th 248, 257 [43 Cal.Rptr.2d 407]; *Estate of Swetmann* (2000) 85 Cal.App.4th 807, 816–817 [102 Cal.Rptr.2d 457], and cases cited therein.)

---

(1) are older than age 64 and (2) would be dependent adults, within the meaning of Section 15610.23, if they were between the ages of 18 and 64. The term 'care custodian' has the meaning as set forth in Section 15610.17 of the Welfare and Institutions Code.

"(d) For purposes of this section, 'domestic partner' means a domestic partner as defined under Section 297 of the Family Code."

[5] Welfare and Institutions Code section 15610.17 is quoted in its entirety at pages 804–805, *post.*

### B. *Were Foley and Erman Care Custodians?*

That decedent was a dependent adult is undisputed.[6] The question is whether Foley and Erman fit the statutory definition of "care custodian."

Before the Court of Appeal in this case rendered its decision, two other Courts of Appeal had concluded that a person who cares for a dependent adult out of a preexisting personal friendship, rather than in an occupational or professional capacity, does not fall within the definition of "care custodian" in Welfare and Institutions Code section 15610.17, subdivision (y) and therefore does not face disqualification as a beneficiary under Probate Code section 21350, subdivision (a)(6). (See *Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035 [6 Cal.Rptr.3d 702] (*Davidson*); *Conservatorship of McDowell* (2004) 125 Cal.App.4th 659 [23 Cal.Rptr.3d 10] (*McDowell*).)

*Davidson* concerned the estate of an elderly woman, Dolores Davidson, who late in life changed her will and trust so as to benefit a personal friend and neighbor, Steve Gungl, who had cared for her during her declining years. Four years before her death, Davidson executed a will and pour-over trust leaving most of her estate to Gungl, thereby revoking her earlier will and trust that had left most of her estate to her cousin Elaine Morken. In the last decade of Davidson's life, Gungl and his life partner visited Davidson often, took her to the doctor, and helped her with household chores. As Davidson declined, Gungl and his partner assumed ever greater responsibility for her, doing her shopping, paying her bills and taking care of her banking. For her part, Davidson treated Gungl and his partner like family, calling them "her boys." (*Davidson, supra,* 113 Cal.App.4th at p. 1042.)

Morken and her husband, who had lived out of state, moved at one point to California but had infrequent contact with Davidson until they learned she had executed an estate plan favoring Gungl. Thereafter, they made a series of complaints to adult protective services, the police and Davidson's neighbors. Ultimately, Davidson was placed in a conservatorship under the charge of the public guardian, her house was sold, and she was placed in a nursing home, where she declined and died. After her death, the Morkens sued to invalidate

---

[6] For purposes of Probate Code section 21350, "the term 'dependent adult' has the meaning as set forth in Section 15610.23 of the Welfare and Institutions Code and also includes those persons who (1) are older than age 64 and (2) would be dependent adults, within the meaning of Section 15610.23, if they were between the ages of 18 and 64." (*Id.,* § 21350, subd. (c).) Welfare and Institutions Code section 15610.23 provides, in relevant part, that " '[d]ependent adult' means any person between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." (*Id.,* subd. (a).)

the trust and will favoring Gungl, asserting he was a care custodian under section 21350 and therefore disqualified to receive Davidson's donative transfer. The trial court found that, while Gungl was a not a blood relative of Davidson's, his concern and affection for her had been lasting, deep and genuine. Ruling that Gungl was not a "care custodian" for purposes of section 21350 and that Davidson had not been subjected to undue influence, the court denied the Morkens' petition to invalidate Davidson's trust and will. (*Davidson*, *supra*, 113 Cal.App.4th at pp. 1040–1046.)

The Court of Appeal affirmed the trial court's ruling. (*Davidson*, *supra*, 113 Cal.App.4th at pp. 1050–1051.) The court opined that "the statute bars donative transfers to individuals who have assumed the role of 'care custodian' to a dependent adult incidental to the professional or occupational provision of health or social services to that dependent adult, rather than in connection with a personal or familial relationship; and whose personal relationship, if any, with the dependent adult is entirely incidental, secondary to, and derived from the preexisting professional or occupational connection." (*Id.* at p. 1052.) Accordingly, the court held, "when an individual becomes what is in effect a care custodian of a dependent adult as a direct result of a preexisting genuinely personal relationship rather than any professional or occupational connection with the provision of health or social services, that individual should *not* be barred by section 21350 from the benefit of donative transfers" (*id.* at pp. 1052–1053).[7]

In *McDowell*, *supra*, 125 Cal.App.4th 659, Kathryn McDowell, an elderly woman living alone, became friends with two men, Reza Fatipoor and another, whom she asked to live in her home in exchange for taking care of her. Two years later, in early 2000, Fatipoor introduced McDowell to Ann Netcharu. McDowell and Netcharu became friends, Netcharu frequently visiting McDowell and bringing her food. In June 2000, McDowell was hospitalized for a broken hip. After her discharge, Netcharu visited her often and regularly brought her meals. Netcharu eventually started taking care of McDowell's personal needs, including bathing and hygiene. Netcharu did not receive payment for these services.

In September 2000, Fatipoor and Netcharu took McDowell to an attorney who prepared a will for her, naming Fatipoor and Netcharu executors and sole beneficiaries. McDowell told a doctor friend of the attorney, who interviewed her, that she was leaving her money to Fatipoor and Netcharu because they were assisting her. During these months, while McDowell's

---

[7] The *Davidson* court relied alternatively on "the kind of unsophisticated care and attention" that Gungl had provided to Davidson—errands, chores and household tasks that "simply cannot be equated with the provision of 'health services and social services' specified by the subject statutes as constituting custodial care." (*Davidson*, *supra*, 113 Cal.App.4th at p. 1050.)

physical condition was deteriorating, Netcharu tried to get medical aid for her. She also called the public guardian to alert him to McDowell's deteriorating condition and took McDowell to the doctor.

In January 2001, a permanent conservator appointed for McDowell petitioned for authority to revoke her will and to execute a trust and new will benefiting Guide Dogs for the Blind. The conservator asserted that Fatipoor and Netcharu had used undue influence over McDowell to gain control of her assets and that McDowell lacked testamentary capacity when she signed the will benefiting them. The trial court rejected these claims. Nevertheless, the court ruled that Netcharu was a "care custodian" and, as such, had failed to rebut the presumption of undue influence arising under section 21350 when a care custodian is named a dependent's beneficiary. (*McDowell*, *supra*, 125 Cal.App.4th at pp. 662–663, 667–668.)

The Court of Appeal reversed. Quoting *Davidson*, the court observed that " '[t]he *controlling* question is whether the relationship between the caregiver and the dependent adult arose out of the provision of health or social services, or whether instead the provision of care developed naturally from a preexisting genuinely personal relationship.' " (*McDowell*, *supra*, 125 Cal.App.4th at p. 673.) Applying that principle, the court concluded the evidence did not support the trial court's finding that Netcharu was a care custodian. She was neither a professional nor an occupational caregiver, nor was there any evidence "she generally offered care services to the elderly and dependent adult population as a paid or volunteer provider." (*Ibid.*) Neither was there evidence that Netcharu's relationship with McDowell "grew out of a preexisting professional or occupational connection" (*id.* at p. 673). Rather, the court found, the evidence showed that Netcharu was a well-meaning friend.

As noted, the Court of Appeal below declined to follow *Davidson* and *McDowell* in recognizing a preexisting personal friendship exception to statutory care custodian status. The Court of Appeal held, to the contrary, that "the definition of care custodian is broad indeed, extending to persons providing *health services* or social services to elderly or dependent adults." Reviewing the services Foley and Erman had provided to decedent, the court noted they were of the sort often rendered by practical nurses.[8] The court concluded the evidence established that Foley and Erman came within the statutory definition.

---

[8] According to the United States Department of Labor, Bureau of Labor Statistics Occupational Outlook Handbook, the tasks that licensed practical nurses perform include, inter alia, "basic bedside care, taking vital signs such as temperature, blood pressure, pulse, and respiration. They also prepare and give injections and enemas, monitor catheters, apply dressings, treat bedsores, and give alcohol rubs and massages. LPNs monitor their patients and report adverse reactions to medications or treatments. They collect samples for testing, perform

### 1. *Statutory language*

In resolving the issue before us, we look first to the statutes' words, as these " 'generally provide the most reliable indicator of legislative intent.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1007 [16 Cal.Rptr.3d 869, 94 P.3d 1071].) As noted, the Legislature has provided that the term "care custodian" for purposes of Probate Code section 21350 has the meaning set forth in section 15610.17 of the Welfare and Institutions Code. (§ 21350, subd. (c).) Our task in interpreting these statutes is "to ascertain and effectuate legislative intent." (*People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].)

In its entirety, Welfare and Institutions Code section 15610.17 provides: " 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: [¶] (a) Twenty-four-hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code. [¶] (b) Clinics. [¶] (c) Home health agencies. [¶] (d) Agencies providing publicly funded in-home supportive services, nutrition services, or other home and community-based support services. [¶] (e) Adult day health care centers and adult day care. [¶] (f) Secondary schools that serve 18- to 22-year-old dependent adults and postsecondary educational institutions that serve dependent adults or elders. [¶] (g) Independent living centers. [¶] (h) Camps. [¶] (i) Alzheimer's Disease day care resource centers. [¶] (j) Community care facilities, as defined in Section 1502 of the Health and Safety Code, and residential care facilities for the elderly, as defined in Section 1569.2 of the Health and Safety Code. [¶] (k) Respite care facilities. [¶] (l) Foster homes. [¶] (m) Vocational rehabilitation facilities and work activity centers. [¶] (n) Designated area agencies on aging. [¶] (o) Regional centers for persons with developmental disabilities. [¶] (p) State Department of Social Services and State Department of Health Services licensing divisions. [¶] (q) County welfare departments. [¶] (r) Offices of patients' rights advocates and clients' rights advocates, including attorneys. [¶] (s) The office of the long-term care ombudsman. [¶] (t) Offices of public conservators, public guardians, and court investigators. [¶] (u) Any protection or advocacy agency or entity that is designated by the Governor to fulfill the requirements and assurances of the following: [¶] (1) The federal Developmental Disabilities Assistance and Bill of Rights Act of 2000, contained in Chapter 144 (commencing with Section 15001) of Title 42 of the United States Code, for

routine laboratory tests, feed patients, and record food and fluid intake and output. To help keep patients comfortable, LPNs assist with bathing, dressing, and personal hygiene. In States where the law allows, they may administer prescribed medicines or start intravenous fluids." (U.S. Dept. Lab., Bur. Lab. Statistics, Occupational Outlook Handbook Bull. No. 2600, p. 1, available online at <http://www.bls.gov/oco/print/ocos102.htm> [as of Aug. 21, 2006].)

protection and advocacy of the rights of persons with developmental disabilities. [¶] (2) The Protection and Advocacy for the Mentally Ill Individuals Act of 1986, as amended, contained in Chapter 114 (commencing with Section 10801) of Title 42 of the United States Code, for the protection and advocacy of the rights of persons with mental illness. [¶] (v) Humane societies and animal control agencies. [¶] (w) Fire departments. [¶] (x) Offices of environmental health and building code enforcement. [¶] (y) *Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults.*" (Italics added.)

Thus, the statutory definition of "care custodian" expressly includes "[a]ny other . . . agency or person providing health services or social services to elders or dependent adults." (Welf. & Inst. Code, § 15610.17, subd. (y).)

Here, the uncontroverted evidence shows that Foley and Erman rendered various services to decedent during the two-month period she resided with them, including health services. Decedent was incapable of caring for herself, so she was dependent on Foley and Erman for her daily needs. Foley did decedent's grocery shopping, prepared some meals for her and occasionally attended to her personal needs, including helping to change the diapers she wore. Foley also made decedent's bed and assisted her with bathing. He applied topical medications to decedent's body, sometimes with Erman's assistance. Additionally, Foley went through decedent's mail for her and, for the last six weeks of decedent's life, handled all her financial and investment affairs, including her bank accounts.

During the same period, Erman prepared meals for decedent, spent every day with her, assisted her in getting to and from the bathroom, helped her into bed, fixed her hair, cleaned her bedroom and did her laundry. Erman washed decedent's face and hands on days when the visiting hospice nurses were not present to bathe her. She administered oral medications to decedent, including liquid morphine to assist decedent when she was having difficulty breathing, dosages of antidepressant drugs, anxiety medication and codeine cough syrup. She helped decedent apply ointments to a rash that had developed in her intimate areas. Erman also cared for decedent's wounds, applying salves and antibiotics to sores on her legs and thereafter bandaging those areas. Devices for monitoring decedent's breathing were placed in decedent's and Erman's bedrooms so that Erman could monitor decedent's breathing.

In sum, the record reflects that both Foley and Erman provided substantial, ongoing health services to decedent while, at the end of her life, she was residing in their home and that it was during this period that decedent amended her Trust to include the donative transfers at issue. Foley concedes

he and Erman engaged in activities that could be performed by a nurse, including the administration of medications and application of topical ointments.[9] Although Foley challenges the Court of Appeal's analysis of the tasks he and Erman performed as "health services" rather than "simple tasks," the court correctly noted that "Erman administered morphine to decedent and provided wound care," calling such services "a far cry from the level of care provided by the longtime friends in *Davidson*," where the assistance offered consisted of cooking, gardening, driving the decedent to the doctor, running errands, grocery shopping, purchasing clothing or medications and assisting her with banking (see *Davidson*, *supra*, 113 Cal.App.4th at p. 1050).

Foley argues that the Court of Appeal in any event erred in focusing on the kind of services he and Erman provided. He urges us to focus instead on whether they provided services on an occupational or professional basis, in the manner of the "public or private facilities or agencies, or persons providing care or services for elders or dependent adults" (Welf. & Inst. Code, § 15610.17) that are listed in subdivisions (a) through (x) of the statutory "care custodian" definition. These definitional categories of care custodian, he argues, reflect public or private facilities or agencies that would come into contact with a dependent adult not as the result of a personal relationship or friendship, but because they are under a duty to provide, or have agreed to provide, services to a dependent adult. Acknowledging that the statutory definition ends with a catchall provision that encompasses "[a]ny other . . . agency or person providing health services or social services to elders or dependent adults" (Welf. & Inst. Code, § 15610.17, subd. (y)), Foley nevertheless suggests that provision should be interpreted to include only similar agencies that serve the same purpose as those specifically listed in the preceding subdivisions. According to Foley, the plain meaning of Welfare and Institutions Code section 15610.17, subdivision (y) is to include those persons who fulfill the tasks performed by the persons and agencies listed in the other 24 categories on an occupational or professional basis.

In essence, Foley's argument is that the language of Welfare and Institutions Code section 15610.17, subdivision (d) must be understood in light of the interpretive canon *ejusdem generis*—"of the same kind." "The principle of *ejusdem generis* instructs that 'when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly

---

[9] As the Court of Appeal noted, notwithstanding Erman was the primary caregiver, Foley conceded he and Erman jointly cared for decedent, thus Foley qualifies equally as a care custodian. Foley would in any event be disqualified under section 21350, subdivision (a)(7), which disqualifies as a donee a cohabitant or domestic partner of a care custodian.

treats items similar in nature and scope.' " (*Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1121 [95 Cal.Rptr.2d 514, 997 P.2d 1169].)

The *ejusdem generis* canon "presumes that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 141 [96 Cal.Rptr.2d 485, 999 P.2d 718].) Here, even if the entities the Legislature has included in subdivisions (a) through (x) of Welfare and Institutions Code section 15610.17 are read as examples of the public or private facilities, agencies or persons to which the Legislature referred in the statute's introductory paragraph—an uncertain premise—they manifestly are not presented as examples of the "*other* protective, public, sectarian, mental health, or private assistance or advocacy agenc[ies] or person[s]" (italics added) to which subdivision (y) of the statute refers. Rather, apparently cast as a broad catchall provision, subdivision (y) offers no examples of either peculiar things or peculiar classes. Therefore, in accordance with our established *ejusdem generis* jurisprudence, we must presume that the Legislature intends "any other . . . person providing health services" in Welfare and Institutions Code section 15610.17, subdivision (y) to be used in its unrestricted sense.

Seeking further to buttress his *ejusdem generis* argument, Foley points to the requirement in subdivision (y) that the agencies or persons provide dependent adults with health or social *services*. (Welf. & Inst. Code, § 15610.17, subd. (y).) As longtime personal friends of decedent, Foley argues, he and Erman did not provide health or social "services" on either a professional or occupational basis. Rather, Foley argues, a person who prepares food for, or applies ointment to, a friend would not be considered as providing a "service" within the plain meaning of the relevant statutes.

■ We disagree with Foley that, in ordinary parlance, one who prepares meals for or applies ointments to another person does not provide that person a service.[10] When construing statutory language, we are, absent contrary direction, bound to give the words the Legislature chose their usual and ordinary meaning. (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) While some of the numerous dictionary definitions of the noun "service" may carry commercial connotations, others do not. (See Webster's New Internat. Dict., *supra*, at p. 2288 [listing 30 definitions].) We discern nothing about the language of Welfare and

---

[10] See, e.g., Webster's New International Dictionary (2d ed. 1958) page 2288 (defining "service," inter alia, as "[p]erformance of labor for the benefit of another" and "[t]he deed of one who serves").

Institutions Code section 15610.17—and in particular the wording of its subdivision (y)—that would justify our presuming the Legislature intended a specialized or narrow usage rather than a general one. (See *Southern California Edison Co. v. State Board of Equalization* (1972) 7 Cal.3d 652, 662–663 [102 Cal.Rptr. 766, 498 P.2d 1014] [finding no statutory indication the Legislature intended special meaning of "sales price" in state use tax statutes].) The single potential linguistic clue is to the contrary. In Welfare and Institutions Code section 15610.17's introductory paragraph, the Legislature declares that " '[c]are custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing *care or services* for elders or dependent adults, including members of the support staff and maintenance staff [of the listed entities]." (Italics added). For us to construe the statute as excluding uncompensated or nonprofessional care on the ground the word "services" implies such exclusion would fly in the face of the broad introductory phraseology cast thus in the disjunctive.

■ In light of the statutory language, we conclude Foley's claim that he and Erman did not serve decedent's health care needs must fail. We find no professional or occupational limitation on the definitional statute's pronouncement that "care custodian" means, among other things, any person providing care or health services to a dependent adult. (Welf. & Inst. Code, § 15610.17, subd. (y).)

Finally, Foley argues that he and Erman were not *custodians* of decedent. He cites dictionary definitions of "custodian" that connote a legal or official caretaking function. He argues that because they were not legally bound to provide decedent a residence or care, neither he nor Erman can properly be considered to have been her custodian.

Notwithstanding the cited dictionary definitions of custodian, nothing in the statutory language suggests the Legislature, when enacting or amending the statutory scheme, understood itself to be using the word "custodian" in a sense that presumes a contractual or other legal duty. The statutory definition of "care custodian" (Welf. & Inst. Code, § 15610.17) includes not only health care institutions, but numerous public and private entities whose employees are in a position to exert undue influence on an elderly person facing death. In its general sense, a custodian is simply "[o]ne who has care or custody . . ." (Webster's New Internat. Dict., *supra*, at p. 650), a definition that clearly applies to Foley and Erman. In any event, irrespective of Foley's selective dictionary definitions, in construing the statutory phrase "care custodian" we are bound to follow the definition the Legislature has supplied. (*People v. Penny* (1955) 44 Cal.2d 861, 870 [285 P.2d 926]; *People v. Pociask* (1939) 14 Cal.2d 679, 683 [96 P.2d 788].)

In sum, we conclude that nothing in the statute's structure, terms or language authorizes us to impose a professional or occupational limitation on the definition of "care custodian" (Welf. & Inst. Code, § 15610.17) or to craft a preexisting personal friendship exception thereto. This conclusion is buttressed by the legislative history of the statute, to which we now turn.

### 2. *Legislative history*

The Legislature added part 3.5 to the Probate Code in 1993 and substantially amended it in 1995. (Stats. 1993, ch. 293, § 8, p. 2021; Stats. 1995, ch. 730, §§ 12–17, pp. 5480–5483.) On the only previous occasion we have had to examine this statutory scheme in any depth, we observed that "[t]he 1993 legislation was introduced in response to reports that an Orange County attorney who represented a large number of Leisure World residents had drafted numerous wills and trusts under which he was a major or exclusive beneficiary, and had abused his position as trustee or conservator in many cases to benefit himself or his law partners." (*Rice v. Clark, supra*, 28 Cal.4th at pp. 97–98 (*Rice*), citing Assem. Com. on Judiciary, Analysis of Assem. Bill No. 21 (1993–1994 Reg. Sess.) as amended Feb. 4, 1993, p. 1.) We noted that "[t]he scheme set out in part 3.5 differs from the preexisting decisional law relating to undue influence (and § 6104) in several respects. Section 21350 applies to all donative transfers by instrument, not only to wills and other testamentary transfers, but it invalidates only gifts to drafters and to fiduciaries (and to persons close to them) who transcribe the instrument or cause it to be transcribed. Unlike the common law, section 21350 does not require, as the predicate for a presumption of invalidity, that the transferee would receive an 'undue' benefit. The transferee, under part 3.5, bears an elevated proof burden in rebutting the presumption: he or she must show the absence of undue influence, fraud or duress by clear and convincing evidence, and without reliance on the testimony of any presumptively disqualified person. (§ 21351, subd. (d).)" (*Rice*, at p. 98, italics omitted.)

We went on in *Rice* to discuss certain amendments to the statutory scheme that were relevant to the issue before us there (see *Rice, supra*, 28 Cal.4th at p. 98), but we have had no occasion specifically to address the legislative history of section 21350's provisions invalidating instrumental transfers to care custodians and their relatives, spouses, domestic partners, cohabitants and employees. (§ 21350, subd. (a)(6), (7).)

Other California courts, however, have recognized that the purpose of section 21350 was "to prevent unscrupulous persons in fiduciary relationships from obtaining gifts from elderly persons through undue influence or other overbearing behavior." (*Bank of America v. Angel View Crippled Children's Foundation* (1999) 72 Cal.App.4th 451, 456 [85 Cal.Rptr.2d 117]; accord,

*Osornio v. Weingarten* (2004) 124 Cal.App.4th 304, 318–319 [21 Cal.Rptr.3d 246].) As originally enacted in 1993, section 21350, subdivision (a) did not include care custodians of dependent adults among presumptively disqualified donees. (See former § 21350, added by Stats. 1993, ch. 293, § 8, p. 2021.) In 1997, the Legislature amended the section to include such care custodians. (See Stats. 1997, ch. 724, § 33; *Osornio*, at p. 319.)

In *Davidson, supra*, 113 Cal.App.4th 1035, the court stated that a legislative committee report indicated that the 1997 amendment to section 21350 "was intended to apply to gifts made 'to practical nurses or other caregivers hired to provide in-home care.' " (*Davidson*, at p. 1050, quoting Sen. Com. on Judiciary, com. on Assem. Bill No. 1172 (1997–1998 Reg. Sess.) p. 4.) Partly on the basis of that report, the *Davidson* court concluded that the legislative intent of the amendment "was to place limitations on the ability of *professional* 'care custodians' to receive donative transfers from elderly testators" (*Davidson*, at p. 1051). Construing the term "care custodian" so as to exclude preexisting personal friends and companions performing "self-sacrificing acts of care and companionship," the court opined, would be congruent with that intent. (*Ibid.*)

Contrary to the *Davidson* court's statement, the portion of the committee report it cited addressed not what effect the Legislature intended the 1997 amendment to have, but the state of existing law at the time the amendment was being considered. The relevant sentence in the report reads in full: "Existing law provides a presumption of invalidity that applies to gifts made to lawyers or other fiduciaries, but not to practical nurses or other caregivers hired to provide in-home care." (Sen. Com. on Judiciary, com. on Assem. Bill No. 1172 (1997–1998 Reg. Sess.) p. 4.)[11] The report, in the same section, noted that the general problem the amendment was intended to address, one obviously not restricted to paid caregivers, was that "care custodians are often working alone and in a position to take advantage of the person they are caring for." (*Id.* at p. 4.)

■ In sum, neither the statutory scheme presumptively disqualifying care custodians from receiving testamentary transfers, nor the definition of "care custodian" the Legislature adopted for the purposes of that scheme, contains or implies an exception for preexisting personal friends of a dependent adult to whom they provide health care services. Were we, moreover, to create such an exception, we would render redundant the express statutory exception for the transferor's relatives and domestic partners. (See § 21351, subd. (a).) A

---

[11] The committee report from which the *Davidson* court obtained its extract was the Senate Judiciary Committee's report on an annual omnibus probate law bill containing numerous and varied provisions making both technical and substantive changes. (See Sen. Com. on Judiciary, com. on Assem. Bill No. 1172 (1997–1998 Reg. Sess.) p. 1.)

construction that renders some statutory language surplusage or redundant is to be avoided. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1023 [32 Cal.Rptr.3d 89, 116 P.3d 550].)

The Legislature's failure to include an express friendship exception within the statutory scheme is significant, because the Legislature knows how to craft such an exception when it wishes to do so. The Legislature has expressly promulgated a friendship exception in another context involving the protection of elderly persons, the Residential Care Facilities for the Elderly Act (Health & Saf. Code, § 1569 et seq.). There, the Legislature excluded from certain licensing requirements "[a]ny arrangement for the care and supervision of a person or persons from only one family by a close friend, whose friendship preexisted the contact between the provider and the recipient, and . . . : [¶] . . . [t]he care and supervision is provided in a home or residence chosen by the recipient [and] [¶] . . . [t]he arrangement is not of a business nature and occurs only as long as the needs of the recipient for care and supervision are adequately met." (Health & Saf. Code, § 1569.145, subd. (f)(2).)

Even more tellingly, the Legislature in section 21351 has expressly excepted other specified classes of potential beneficiaries from disqualification under section 21350. Section 21351, subdivision (a) nullifies application of section 21350 to transferees who are related to the transferor by blood, marriage or domestic partnership, or who are cohabitants with the transferor.[12] As the Court of Appeal below explained, had the Legislature wished also to exempt preexisting personal friends from the definition of care custodian, it could have done so. "It is the role of the courts to interpret and apply the laws as enacted, not to usurp the legislative function."

"In enacting sections 21350 and 21351, the Legislature was aware that certain individuals are uniquely positioned to procure gifts from elderly persons through fraud, menace, duress or undue influence." (*Graham v. Lenzi, supra*, 37 Cal.App.4th at p. 256.) Regrettably, preexisting personal friendship is no guarantee against the exercise of fraud, menace, duress or undue influence over dependent adults.

---

[12] Probate Code section 21351, subdivision (a) incorporates the definition of "cohabitant" contained in section 13700 of the Penal Code; thus, " 'cohabitant' means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship." (Pen. Code, § 13700, subd. (b).)

Our conclusion accords with the overall purpose of section 21350. The public policy underlying that statute "is expressly articulated in Evidence Code section 605, which provides that '[a] presumption affecting the burden of proof is a presumption established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied, *such as the policy in favor of . . . the security of those who entrust themselves or their property to the administration of others.*'" (*Graham v. Lenzi, supra,* 37 Cal.App.4th at p. 257.) Nothing in the legislative history suggests the Legislature harbored a lesser concern for the security of dependent Californians who entrust themselves to personal friends or acquaintances than it did for those whose care custodians are paid professionals.

Section 21350 (set out in full in fn. 4, *ante*) lists seven categories of persons who are presumptively barred from receiving a donative transfer from a dependent adult. These categories cover various relationships between donor and donee that might logically offer opportunities for duress or undue influence. The statutory list includes the person who drafted the donative instrument (§ 21350, subd. (a)(1)), persons with specified relationships to the drafter (*id.,* subd. (a)(2)–(3)), a fiduciary who transcribed the instrument (*id.,* subd. (a)(4)), persons with specified relationships to the fiduciary transcriber (*id.,* subd. (a)(5)), a care custodian (*id.,* subd. (a)(6)), and persons with specified relationships to the care custodian (*id.,* subd. (a)(7)). As to all the categories set forth in section 21350, section 21351 expressly exempts cases in which the transferor is related to the transferee by blood or marriage, or in other specified ways (§ 21351, subd. (a)); notably it includes no similar exemption for situations where transferor and transferee otherwise have a preexisting social relationship.

Some of the persons described in subsections (1) through (5) of section 21350, subdivision (a) might be expected to have personal, rather than or in addition to, professional relations with the donor/dependent adult. Yet the statute nowhere suggests that, if they otherwise fall within subsections (1) through (5), the donor's preexisting friends, neighbors and social acquaintances are to be excluded from those persons presumptively barred from receiving donative transfers from the dependent adult. We discern no reason why the Legislature would want to include as prohibited donees preexisting friends of the dependent adult who fall within subsections (1) through (5) of section 21350, subdivision (a), but, under subsection (a)(6), exclude preexisting friends who provide care and service, on that basis, to the transferor. The relationship between dependent adult and caregiver, however it originates, is at least as rife with opportunity for duress and undue influence as the other relationships described in section 21350.

Welfare and Institutions Code section 15610.17, from which Probate Code section 21350, subdivision (c) imports the definition of "care custodian," is part of the Elder Abuse and Dependent Adult Civil Protection Act of 1994 (Elder Abuse Act). (Stats. 1994, ch. 594, § 3, pp. 2933, 2934–2935.) The legislative intent underlying the Elder Abuse Act was to create an expansive class of individuals obligated to report elder abuse to the proper authorities. (See *id.*, § 1, pp. 2932–2933.) The Legislature, when defining "care custodian" for purposes of the Elder Abuse Act, declared that its intent was very broad, specifically, "to provide that [proper authorities] shall receive referrals or complaints from public or private agencies, from any mandated reporter submitting reports pursuant to [Welfare and Institutions Code] Section 15630, *or from any other source having reasonable cause to know that the welfare of an elder or dependent adult is endangered . . . .*" (*Id.*, § 1, subd. (i), p. 2933, italics added.) Consonant with that intent, the Elder Abuse Act itself, as protective legislation, provides no exception from its mandatory reporting provisions even for a victim's blood relatives, let alone for a victim's preexisting personal friends. (See *id.*, § 3, pp. 2934–2935.)

 In short, neither the statutory language nor the legislative history supports a preexisting personal friendship exception to section 21350's presumptive disqualification of care custodian donees. It is not for us to gainsay the wisdom of this legislative choice. In the event, however, we have mistaken the Legislature's intention, that body may readily correct our error.

### 3. *Public policy*

Citing the principle that where uncertainty exists as to the meaning of statutory language, consideration should be given to the consequences that will flow from a particular interpretation (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323]), Foley argues, finally, that undesirable public policy consequences will follow our affirming the judgment of the Court of Appeal.

First, Foley notes it is sometimes infeasible for nurses to administer health care services to dependent adults, whether because needs arise when a nurse is not present or because the family is financially unable to secure professional assistance solely to apply an ointment or bandage or to administer medications to the dependent adult. He emphasizes that when he and Erman administered medications and applied ointments to decedent, they were proceeding pursuant to the instructions of a nurse who attended decedent. If the Court of Appeal decision is affirmed, Foley asserts, one can envision circumstances where a caregiver instructed by a nurse to apply a topical ointment refuses to do so for fear of invalidating a gift.

Second, Foley argues that we should exempt preexisting personal friends from the operation of section 21350, subdivision (a)(6) in order to vindicate the public policy of honoring a decedent's testamentary disposition. Absent such an exemption, Foley argues, dependent adults may be forced in a difficult period of life to expend time, money and energy arranging for a certificate of independent review (see § 21350, subd. (b)) in order to ensure their intended transfers are honored.

Finally, Foley urges the interests of potential beneficiaries whose prospects may be affected by the statutory scheme. Lacking a certificate of independent review, a potential beneficiary may have difficulty overcoming a section 21350 presumption. In order to do so, a care custodian must present clear and convincing evidence, not based solely on his or her own testimony, that the transfer was not the product of fraud, duress, menace or undue influence. (§ 21351(d).) And if the court finds the transfer *was* the product of fraud, menace, duress or undue influence, the disqualified beneficiary must bear all costs of the proceeding, including reasonable attorney fees. (*Ibid.*) The Court of Appeal in *Davidson* characterized the application of these provisions to persons who provide health care services out of friendship as "effectively punishing . . . individuals for the self-sacrificing acts of care and companionship they provide . . . to the aging." (*Davidson, supra,* 113 Cal.App.4th at p. 1051.)

We acknowledge that application of the statutory scheme to particular care custodians may in some instances result in inequity. But in light of the statute's language and history, "we need not strain to discern (because we are not free to impose) a universally 'desirable result in terms of public policy' " (*Samuels v. Mix* (1999) 22 Cal.4th 1, 20 [91 Cal.Rptr.2d 273, 989 P.2d 701]). Moreover, even were we authorized to impose the exceptions Foley proposes, we are not persuaded good policy would counsel that we do so. Rather, unless and until the Legislature declares otherwise, we believe the result we reach makes practical sense in a society that is experiencing a rise in elder abuse cases.

The statutory scheme neither states nor implies that to qualify as a care custodian an individual must receive compensation. (See *Estate of Shinkle, supra,* 97 Cal.App.4th at p. 1006 [volunteer ombudsman was care custodian].) Concern about fairness to volunteer health care providers is ultimately unfounded because section 21351 provides a clear pathway to avoiding section 21350. Section 21351, subdivision (b) renders section 21350 inapplicable if the donative instrument "is reviewed by an independent attorney who (1) counsels the client (transferor) about the nature and consequences of the intended transfer, (2) attempts to determine if the intended consequence is the result of fraud, menace, duress, or undue influence, and (3) signs and delivers

to the transferor . . . [a] 'CERTIFICATE OF INDEPENDENT REVIEW,' " in which counsel asserts the transfer is valid because it is "not the product of fraud, menace, duress, or undue influence."

Finally, we find Foley's specter of caregivers refusing to perform services for fear of losing a testamentary gift unpersuasive. Any caregiver who would for that reason alone abstain from helping an elderly friend would by hypothesis be a caregiver with designs on being included in the elder's future estate plan—precisely the situation the statutory scheme was meant to address. (See *Osornio v. Weingarten, supra*, 124 Cal.App.4th at pp. 318–319; *Bank of America v. Angel View Crippled Children's Foundation, supra*, 72 Cal.App.4th at p. 456.)

This, we emphasize, is not a case where preexisting friends who were testamentary beneficiaries of a testator subsequently became care custodians; Foley and Erman became beneficiaries of the Trust only pursuant to changes decedent made in her will while she was living with them and they were providing her with care services. Section 21351(d)'s rebuttable presumption is not a ban on care custodians' receiving gifts; it is simply a protection against their seeking or obtaining gifts by fraud, menace, duress or undue influence. Care custodians who can meet the proof requirements the Legislature has prescribed in section 21351(d) will remain eligible to receive donative transfers.[13] And in providing for a certificate of independent review (§ 21351, subd. (b)), the Legislature has provided transferors who so desire with a ready mechanism for making donative transfers to care custodians.

### C. *Undue Influence*

Independently examining the record, the Court of Appeal concluded that Foley had failed to adduce substantial evidence to rebut the statutory presumption that decedent's transfers to him and Erman were the product of undue influence. (See § 21351(d).) The petition for review raised no question concerning this conclusion, and the parties' briefs on the merits do not address it.

---

[13] It bears repeating that the Legislature has exempted from disqualification under section 21350 care custodians related by blood or marriage to, who cohabit with, or are the registered domestic partners of, a dependent adult from whom they receive a testamentary gift (see § 21351, subd. (a)); hence, our resolution of this matter cannot affect such persons.

*Disposition*

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.[14]

George, C. J., Baxter, J., and Chin, J., concurred.

**GEORGE, C. J.,** Concurring.—I wholly agree that Welfare and Institutions Code, section 15610.17 does not include a professional or occupational limitation on, or a preexisting personal friendship exception to, the definition of "care custodian" provided by the statute. (Maj. opn., *ante*, at pp. 808–809.) That section and the statutory scheme inclusive of Probate Code sections 21350, subdivision (a)(6) and 21351, subdivision (d), presumptively disqualifying care custodians as beneficiaries of testamentary transfers, do not contain or imply "an exception for preexisting personal friends of a dependent adult to whom they provide health care services." (Maj. opn., *ante*, at p. 810.)

I also observe that the circumstances of the present case illustrate the Legislature's well-founded concern—reflected in its adoption of statutory language sufficiently broad to encompass uncompensated caregivers—that individuals acting as unpaid care custodians of a dependent adult and not related to that adult potentially may exercise undue influence over their charge as readily as professional or occupational care custodians.[1]

At the same time, it appears to me that in other, fairly common factual circumstances involving uncompensated caregivers, application of these statutory provisions may disserve the legislative goals implicit in their enactment. Accordingly, notwithstanding our customary and proper reticence in encouraging legislative action, in the present context I believe the Legislature would do well to consider modifying or augmenting the relevant provisions in order to more fully protect the interests of dependent adults and society as a whole, by according separate treatment to longer term care custodians who undertake that role as a consequence of a personal relationship rather than as an occupational assignment.

---

[14] *Conservatorship of McDowell, supra,* 125 Cal.App.4th 659, *Conservatorship of Davidson, supra,* 113 Cal.App.4th 1035, and *Estate of Shinkle, supra,* 97 Cal.App.4th 990, are disapproved to the extent they interpreted section 21350 as allowing for a preexisting personal friendship exception.

[1] To fairly distinguish the present situation from circumstances that may well warrant a different legislative response, I set forth below additional factual background supplementing what is provided in the majority opinion.

I

The matter before us presents, in the words of plaintiffs' attorney at oral argument, "a classic case of what the Legislature was trying to protect against." As explained in the majority opinion, relatives of the decedent filed suit to invalidate the seventh and final amendment to Carmel Bosco's trust, executed three days prior to her death, that for the first time made defendants her sole residual beneficiaries. As is apparent from evidence received at the trial, several amendments closely preceding (and apparently anticipating) the final amendment to the trust belie the conclusion that Bosco acted merely out of personal preference. Considered in light of the statutory presumption that we have held applicable to uncompensated care custodians who become beneficiaries of a testamentary instrument, these amendments (including the final amendment) together with the other evidence in the record do not constitute substantial evidence in support of the trial court's alternative finding—premised upon its assumed application of the statutory presumption—that defendants had rebutted the presumption.

Carmel Bosco died childless on September 28, 2001, at 97 years of age, leaving an estate valued at approximately $448,000. Bosco had created the trust in 1991. Apparently to ensure the payment of expenses associated with the continuing care of Bosco's youngest sister, Ann Cassell (one of the plaintiffs herein), as an Alzheimer's patient, Bosco designated Ann to receive one-third of the trust estate. Bosco named other relatives as co-equal beneficiaries of the residual estate, and named a successor trustee (succeeding Bosco) and an alternate trustee. In the first three amendments, made between 1991 and early 2001, Bosco named different successor trustees. Erman and Foley, longtime personal friends of Bosco's, were not mentioned in the original trust or in the first three amendments.

Within several months preceding her death, however, Bosco amended the trust four times. The fourth amendment, dated June 12, 2001, was the final amendment executed in the presence of Bosco's attorney, Marc Eagan, who drafted the original trust and all seven amendments. The fourth amendment for the first time named defendant Foley as a successor cotrustee with Patricia Tally (a relative of Bosco's who had assisted her with her daily needs during the preceding four years), changed Ann Cassell's one-third interest in the estate from an outright distribution to a life estate, to be held in the trust and used for Cassell's care in amounts deemed reasonable by the trustees in light of other available income and resources, and provided that, of the 11 relatives named equal residual beneficiaries, Michael Colca (who had become disabled) would receive distributions of his share in the trustee's "absolute discretion."

At the repeated urging of defendant Erman, Bosco moved from her own residence in Alhambra on July 26, 2001, into a house shared by Foley and Erman in Riverside. Erman and Foley, having learned that Bosco had lung cancer, assumed the administration of Bosco's financial and investment affairs. The fifth trust amendment, dated August 12, 2001, for the first time named defendant Foley as the *sole* successor trustee, declared that Foley was entitled to reimbursement of expenses and a reasonable trustee's fee, and further specified that any third person dealing with the successor trustee "shall accept, and shall be absolutely entitled to rely upon," the successor trustee's statement that he or she is successor in accordance with provisions of the trust. Between August 20 and September 6, 2001, Foley listed Bosco's Alhambra residence for sale and sold it for $265,000.

The sixth amendment to the trust, dated September 11, 2001, deleted the names of Michael Colca and two other relatives, so that eight relatives remained as beneficiaries of the residual estate. The seventh amendment, dated September 25, 2001, deleted the name of an additional residual beneficiary, and eliminated entirely Ann Cassell's one-third life estate interest in the trust estate. In explanation, Foley testified that Bosco had been informed that Cassell would be supported by Cassell's husband, Alvin, although Alvin testified such a conversation did not take place. For the first time, it was provided (in the seventh amendment) that the seven remaining relatives, formerly designated equal beneficiaries of the residual estate, instead would receive $25,000 each. For the first time, defendants were designated sole residual beneficiaries, giving them, in view of the estate's estimated value of $448,000, the "lion's share" of the estate. In drafting the amendment, Marc Eagan, Bosco's attorney, did not inform Bosco that Foley and Erman would receive the majority of the estate.

## II

The circumstances underlying the present case illustrate the Legislature's wisdom in including, within the meaning of the statutes presumptively disqualifying a care custodian from becoming a testamentary beneficiary of the dependent adult, uncompensated friends or acquaintances who provide substantial, ongoing health or other services to a dependent adult. (Prob. Code, §§ 21350, subd. (a)(6), 21351, subd. (d).) In adopting the broad definition of a care custodian required to report elder abuse (Welf. & Inst. Code, § 15610.17) for purposes of defining those persons and entities subject to the presumption of undue influence under the Probate Code, the Legislature implicitly recognized that an individual acting in a caregiving capacity on behalf of a dependent adult who requires substantial, if not total care, assumes a role uniquely susceptible of exerting substantial influence over the dependent person, regardless of the formality of the arrangement.

That having being said, it is not difficult to imagine circumstances in which an unrelated individual, motivated by long-standing friendship, moral obligation, or other personal incentive, undertakes without compensation to provide substantial, ongoing health care services on behalf of a dependent adult—for an extended period. In such a case, the recipient of those services eventually may decide to recognize those acts by modifying his or her testamentary disposition of property to include the caregiver as a beneficiary. In the event the dependent adult modifies the instrument but thereafter expires prior to obtaining certificated independent review pursuant to Probate Code section 21351, subdivision (b), the uncompensated long-term caregiver in that example, no less than the defendants in the present circumstances, would be presumptively disqualified from receiving that beneficial bequest.

In my view, it is questionable whether the uncompensated individual who in a nonoccupational capacity provides substantial, ongoing health services to a dependent adult for an extended period and eventually is made his or her beneficiary, should be subject to the identical presumptive disqualification and burden of proof imposed upon an individual who assumes the role of an unpaid caregiver for a relatively brief period preceding the dependent adult's favorable modification of a testamentary disposition, at a time that is fairly proximate to death.

As a practical matter, the justification for presuming an exercise of undue influence is less compelling when an individual having a preexisting personal relationship with the dependent adult renders health care and other services over a relatively lengthy period of time. First, the likelihood is less that a personal friend gratuitously providing substantial, ongoing health care services over a lengthy term is motivated by the prospect of obtaining undue economic benefit by coercing a testamentary modification. Second, an uncompensated but well-established caregiving relationship affords greater opportunity to the donor's relatives and other interested parties to observe the course of the relationship and to resolve any concerns occasioned by the caregiver's position of trust and potential ability to exert undue influence.

As a matter of policy, it is of doubtful social efficacy to apply the statutory presumption and evidentiary burden to an individual who in a nonprofessional capacity undertakes the serious responsibilities attending the long-term care of a dependent adult. To do so is counterintuitive to our sense that the uncompensated efforts of such an individual, benefiting the dependent adult in question and society in general, should be recognized and encouraged.

Our most basic judicial task in the case before us consists of construing the statutory enactment in its present form and not in crafting or recommending its modification. Manifestly, the majority has accomplished the former task,

interpreting Probate Code section 21350, subdivision (a)(6) to apply equally to professional, compensated persons and nonprofessional, uncompensated persons who act as care custodians in providing substantial, ongoing health services to a dependent adult. Although I believe our statutory construction is correct and have no reservation regarding its application in the present case, applying the statute to those persons who have undertaken the long-term care of a dependent adult without compensation does not appear to take full measure of the importance to the individual or the benefits to society of such efforts born of preexisting personal relationships.

Accordingly, I would suggest legislative modification of the relevant statutes to exempt or otherwise limit application of the statutory presumption of undue influence in the case of uncompensated care custodians who provide long-term health care and other services for dependent adults. Such an exemption or limitation might resemble a standard originally applicable in the federal taxation of estates. Formerly, a decedent's estate was required to include in the gross estate all gifts made "in contemplation of death," a description that presumptively included the value of all gifts made by the decedent within three years of his or her death. (See 26 U.S.C. former § 2035(a); *United States v. Hemme* (1986) 476 U.S. 558, 563 [90 L.Ed.2d 538, 106 S.Ct. 2071]; *Wheeler v. U.S.* (5th Cir. 1997) 116 F.3d 749, 760 [the former " 'contemplation-of-death' provision" was replaced by the rule set forth in 26 U.S.C. § 2035(a) providing that transfers within three years of death are included in the gross estate]; *Hutchinson v. C.I.R.* (7th Cir. 1985) 765 F.2d 665, 669 [to forestall litigation seeking to ascertain whether a decedent made a transfer in contemplation of death, the Tax Reform Act of 1976 converted the statutory presumption into a mandatory rule that the value of all gifts made by the decedent within three years of death must be included in the gross estate].)

In similar fashion, for purposes of testamentary transfers, the language in California's statutes conditionally disqualifying donative transfers to a care custodian—subject to rebuttal of the presumption of undue influence (Prob. Code, §§ 21350, 21351)—could be amended to provide that a change in testamentary disposition made by a dependent adult designating the care custodian as a beneficiary, within one year following the commencement of a new nonprofessional caregiving relationship or within one year preceding the death of the dependent adult, will be subject to the presumption of undue influence. In the situation where the donative transfer to an individual precedes his or her assumption of responsibilities as a care custodian or is made prior to the time that the donor assumes the status of a dependent adult, the statutory presumption would not apply. Similarly, where the donative transfer to a care custodian who provides uncompensated health care and other services to the dependent adult is made more than one year following

the commencement of those caregiving services, the statutory presumption would not apply under such a proposed change.

**CORRIGAN, J.,** Dissenting.—I respectfully dissent. If the Legislature wanted Welfare and Institutions Code section 15610.17[1] to apply to anyone who provided care to elderly or dependent adults, whether professionally or otherwise, they simply would have said so. The impact and the import of the repeated use of such terms as "agency," "office," "facility," "school," "center," "department," etc., convey an intention to describe people who provide care or assistance through some formal relationship, rather than on a private friendship or familial basis. The use of the term "person" twice in the course of this lengthy provision demonstrates an intent to set out the broadest scope of those who offer care through the operation of an agency, office, facility, etc. The Legislature included, for example, support and maintenance staff, teachers, advocates, lawyers, ombudsmen, and firefighters. If it had intended to include "everybody who treated an elderly person with kindness," it certainly would have been easy to do so. It painstakingly articulated a large

---

[1] Welfare and Institutions Code section 15610.17 provides: " 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: [¶] (a) Twenty-four-hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code. [¶] (b) Clinics. [¶] (c) Home health agencies. [¶] (d) Agencies providing publicly funded in-home supportive services, nutrition services, or other home and community-based support services. [¶] (e) Adult day health care centers and adult day care. [¶] (f) Secondary schools that serve 18- to 22-year-old dependent adults and postsecondary educational institutions that serve dependent adults or elders. [¶] (g) Independent living centers. [¶] (h) Camps. [¶] (i) Alzheimer's Disease day care resource centers. [¶] (j) Community care facilities, as defined in Section 1502 of the Health and Safety Code, and residential care facilities for the elderly, as defined in Section 1569.2 of the Health and Safety Code. [¶] (k) Respite care facilities. [¶] (l) Foster homes. [¶] (m) Vocational rehabilitation facilities and work activity centers. [¶] (n) Designated area agencies on aging. [¶] (o) Regional centers for persons with developmental disabilities. [¶] (p) State Department of Social Services and State Department of Health Services licensing divisions. [¶] (q) County welfare departments. [¶] (r) Offices of patients' rights advocates and clients' rights advocates, including attorneys. [¶] (s) The office of the long-term care ombudsman. [¶] (t) Offices of public conservators, public guardians, and court investigators. [¶] (u) Any protection or advocacy agency or entity that is designated by the Governor to fulfill the requirements and assurances of the following: [¶] (1) The federal Developmental Disabilities Assistance and Bill of Rights Act of 2000, contained in Chapter 144 (commencing with Section 15001) of Title 42 of the United States Code, for protection and advocacy of the rights of persons with developmental disabilities. [¶] (2) The Protection and Advocacy for the Mentally Ill Individuals Act of 1986, as amended, contained in Chapter 114 (commencing with Section 10801) of Title 42 of the United States Code, for the protection and advocacy of the rights of persons with mental illness. [¶] (v) Humane societies and animal control agencies. [¶] (w) Fire departments. [¶] (x) Offices of environmental health and building code enforcement. [¶] (y) Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults."

All further section references are to the Welfare and Institutions Code unless otherwise indicated.

group, but one that is more circumscribed than "everyone." Read in connection with the preceding subdivisions, section 15610.17, subdivision (y) is fairly interpreted as a catchall designed to include those who give care in some formalized or professional capacity.

The statute does refer to *persons* who provide care.[2] However, this reference is immediately followed by the phrase "including members of support staff and maintenance staff." Individuals providing care on a personal basis do not do so through support or maintenance *staffs*. Therefore, the language the Legislature chose clearly expresses an intent to encompass only those involved in providing services in a professional or formal capacity.

The remainder of the statute confirms this conclusion. It lists 24 categories of care providers, all of whom act in a professional or formal capacity. The term *person* does not appear again until the 25th category, which is "[a]ny other protective, public, sectarian, mental health, or private assistance or advocacy agency *or person* providing health services or social services to elders or dependent adults." (§ 15610.17, subd. (y), italics added.) The introductory phrase "[a]ny other" links this category to the other 24 on the list. In other words, the principle of *ejusdem generis* applies here, contrary to the conclusion reached by the majority (maj. opn., *ante*, at pp. 806–807). The principle presumes that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples special things or classes of things since those descriptions would then be surplusage. (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 141 [96 Cal.Rptr.2d 485, 999 P.2d 718].) Again, if the Legislature had intended the donative transfer restrictions to apply to any person who provides care, it would simply have said so, rather than list 24 specific categories of persons to whom the provision applies.

The legislative history supports this reading. "As made clear by discussion of the legislation in an analysis prepared for the Senate Judiciary Committee, the enactment of the amendment adding 'care custodians' to the list of presumptively invalid recipients of donative transfers was intended to apply to gifts made 'to practical nurses or other caregivers hired to provide in-home care.' (Sen. Com. on Judiciary, com. on Assem. Bill No. 1172 (1997–1998 Reg. Sess.) p. 4.) The original proponent of the proposal for the amendment was the Estate Planning Trust and Probate Law Section of the State Bar of California in its annual omnibus bill. In a document prepared by that section discussing the proposed amendment, the 'Purpose' of the amendment was described as 'to prevent the growing "cottage industry" of "practical nurses"

---

[2] " 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff . . . ." (§ 15610.17.)

from successfully taking advantage of dementing elders.' The 'Application' of the amendment is similarly described: 'This would . . . remove the incentives for the growing "cottage industry" of "practical nurses" to attempt to take advantage of dementing elders.' (Cal. State Bar Estate Planning, Trust & Prob. Law Section, Legislative Proposal, Assem. Bill No. 1172, excerpted from Senate Com. on Judiciary legislative bill file.)" (*Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035, 1050–1051 [6 Cal.Rptr.3d 702] (*Davidson*).)

The majority opinion discounts the conclusion of *Davidson, supra,* 113 Cal.App.4th 1035. "Contrary to the *Davidson* court's statement, the portion of the committee report it cited addressed not what effect the Legislature intended the 1997 amendment to have, but the state of existing law at the time the amendment was being considered. The relevant sentence in the report reads in full: 'Existing law provides a presumption of invalidity that applies to gifts made to lawyers or other fiduciaries, but not to practical nurses or other caregivers hired to provide in-home care.' (Sen. Com. on Judiciary, com. on Assem. Bill No. 1172 (1997–1998 Reg. Sess.) p. 4.)" (Maj. opn., *ante*, at p. 810.)

I am not persuaded. Instead, it appears that the committee was observing that the existing state of the law was unsatisfactory and that its reach should be extended to "practical nurses or other caregivers *hired* to provide in-home care." (Sen. Com. on Judiciary, com. on Assem. Bill No. 1172 (1997–1998 Reg. Sess.) p. 4, italics added.)

In terms of public policy, it seems unwise to penalize Good Samaritans by making them less eligible to receive the gratitude of those they help, the kinder they have been.[3] As the majority opinion points out, Foley and Erman welcomed the decedent into their own home and performed a variety of challenging, personal, and distasteful tasks to ease the burdens of her final illness. (Maj. opn., *ante*, at p. 805.) The law should not cast a jaundiced eye on those who provide such care to family or friends, and there is no reason to believe the Legislature intended such an outcome.

Foley and Erman may have performed these acts in order to unduly influence decedent. They may also have simply been benevolent people willing to help another soul in need and to whom the decedent wanted to

---

[3] The majority imports the terms *substantial* and *ongoing* care into the statute without supporting citation of statutory language or legislative history. (Maj. opn., *ante*, at pp. 797, 805–806.) This gives rise to an unfortunate irony. Those who provide only trivial or undependable care may inherit, while those whose care is substantial and ongoing are not only to be denied, but also assessed costs and attorney fees. (Prob. Code, § 21351, subd. (d).) Under this analysis, the caring and reliable would be well advised to suppress their kind impulses.

express her natural and well-founded gratitude. Resolution of this factual question should be left to the trial court. Placing the burden of proof on the challengers, rather than on the nonprofessional caregivers, would give deference to the expressed will of the decedent, and it would not place those who help the infirm out of the kindness of their hearts at a disadvantage with regard to those who may have ignored them.

The majority opinion observes, "The Legislature's failure to include an express friendship exception within the statutory scheme is significant, because the Legislature knows how to craft such an exception when it wishes to do so." (Maj. opn., *ante*, at p. 811.)

However, it is also significant that the Legislature did not amend the statute to "clarify" its intent after *Davidson, supra*, 113 Cal.App.4th 1035, and *Conservatorship of McDowell* (2004) 125 Cal.App.4th 659 [23 Cal.Rptr.3d 10].

Moreover, the majority misplaces the emphasis here. This case does not require the creation of an exception. The statute under consideration is *itself* an exception to the general rule that one may freely dispose of personal assets. Thus, the statute should be interpreted narrowly in terms of the exception it creates.

While it is certainly true that nonprofessionals may take advantage of the infirm, it is also true that the kind and generous may act graciously to ease the suffering of those in need. The motives at play in any given case is the kind of factual question the trial court exists to resolve. Absent a clear legislative pronouncement to the contrary, we should allow the court to do so without an artificially imposed presumption.

The majority observes, "Concern about fairness to volunteer health care providers is ultimately unfounded because section 21351 provides a clear pathway to avoiding section 21350. Section 21351, subdivision (b) renders section 21350 inapplicable if the donative instrument 'is reviewed by an independent attorney who (1) counsels the client (transferor) about the nature and consequences of the intended transfer, (2) attempts to determine if the intended consequence is the result of fraud, menace, duress, or undue influence, and (3) signs and delivers to the transferor . . . [a] "CERTIFICATE OF INDEPENDENT REVIEW," ' in which counsel asserts the transfer is valid because it is 'not the product of fraud, menace, duress, or undue influence.' " (Maj. opn., *ante*, at pp. 814–815.)

Kind people are hard to come by, sadly, and they may be legally unsophisticated. Further, cooking, cleaning, and tending the infirm may leave little time to seek the advice of an attorney. Indeed, one might wonder about the selflessness of their intent if they did. In light of these realities, one might legitimately question whether section 21351 really provides the "clear pathway" to fairness the majority suggests.

Kennard, J., and Moreno, J., concurred.