[No. S156898. Jan. 22, 2009.]

In re CORRINE W., a Person Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY BUREAU OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
Y.C., Defendant;
CORRINE W., Movant and Appellant.

## COUNSEL

Courtney Phleger, under appointment by the Supreme Court, for Movant and Appellant.

Mary Regina Deihl for Legal Advocates for Permanent Parenting as Amicus Curiae on behalf of Movant and Appellant.

Corene Kendrick and Abigail Trillin for Youth Law Center, Legal Services for Children and National Association of Counsel for Children as Amici Curiae on behalf of Movant and Appellant.

Silvano B. Marchesi, County Counsel, and Steven P. Rettig, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—We granted review to examine the lower courts' determination that a county bureau of children and family services need not pay for automobile liability insurance for a dependent minor in foster care. We affirm.

## I. FACTS

Corrine W. was removed from her mother's custody at the age of 16, declared to be a dependent of the court (see Welf. & Inst. Code, § 300) and placed in foster care with a friend's family. When Corrine reached the age of 17, she was a senior in high school, and had completed driver's education, passed the written driving test, received a provisional driver's permit and begun supervised driving practice. She encountered difficulty, however, in obtaining a driver's license. An adult must ordinarily sign a minor's license application, and the person who signs thereby assumes civil liability for any damages caused by the minor's driving. (Veh. Code, §§ 17701, 17707.) Corrine's foster parents and natural mother, unwilling to assume liability or to pay for her automobile liability insurance, declined to sign her application. California law also permits a child protective services worker to sign a foster child's application, without assuming personal liability, but only "if the minor files proof of financial responsibility . . . ." (Veh. Code, § 17701; see *id.*, § 16430 et seq. [proof of financial responsibility].) Corrine did not file proof of financial responsibility, and the Contra Costa County Bureau of Children and Family Services (hereafter the Bureau) would not pay for her insurance. Accordingly, the Bureau also declined to sign her license application.

Corrine challenged the Bureau's decision by filing a "motion to compel support services," asking the court, in effect, to order the Bureau to pay for her automobile liability insurance. In support of the motion, she cited Welfare and Institutions Code section 11460, which provides that "[f]oster care providers shall be paid a per child per month rate in return for the care and supervision of [each foster] child placed with them" (*id.*, subd. (a)), and which defines "care and supervision" as including "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, *liability insurance with respect to a child*, and reasonable travel to the child's home for visitation" (*id.*, subd. (b), italics added). The court denied the motion. Corrine appealed, and the Court of Appeal unanimously affirmed. We granted review.

## II. DISCUSSION

Corrine offers two arguments in support of her claim that the Bureau must pay for her automobile liability insurance. First, she argues the plain language

of Welfare and Institutions Code section 11460, subdivision (b), compels payment. Second, she contends the superior court has discretionary power to order payment under various statutes defining the courts' powers in dependency cases (*id.*, §§ 202, subd. (a) [purpose of juvenile court law], 362, subd. (a) [powers of court with respect to dependent children], and 362.05 [dependent child's right to participate in extracurricular, enrichment and social activities]), and that the court abused its discretion in not ordering payment. Neither argument has merit.

### A. *Welfare and Institutions Code section 11460.*

The first statute under which Corrine seeks payment for automobile liability insurance belongs to a coordinated set of federal and state statutes under which those governments offer financial support to foster care providers. The federal government makes block grants for this purpose to the states, and the states distribute the money to the ultimate recipients pursuant to plans developed jointly by the federal Department of Health and Human Services (hereafter the DHHS) and the responsible state agencies. (42 U.S.C. § 622(a).) The federal government provides this assistance through the Aid to Families with Dependent Children-Foster Care (AFDC-FC) program, established in title IV, part E, of the Social Security Act. (42 U.S.C. § 670 et seq.) California receives federal AFDC-FC block grants, supplements the federal grants with state funds, and distributes these monies through the State Department of Social Services (DSS) and county social services agencies. (See Welf. & Inst. Code, § 11460 et seq.)

To receive federal block grants under the AFDC-FC program, a state must, among other things, make "foster care maintenance payments." (42 U.S.C. §§ 671(a)(1), 672(a).) As relevant here, section 675(4)(A) of title 42 of the United States Code defines "foster care maintenance payments" as "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, *liability insurance with respect to a child*, and reasonable travel to the child's home for visitation." (*Ibid.*, italics added.) The legislative history of Public Law No. 96-272 (June 17, 1980) 94 Stat. 500, which added this language to the United States Code in 1980, sheds no light on the meaning of the italicized phrase.[1] The California Legislature, to meet the state's obligations

---

[1] On this point, the legislative history shows only that the Senate Finance Committee added the language defining "foster care maintenance payments" (42 U.S.C. § 675(4)(A)), which includes the reference to liability insurance, to alleviate "general confusion about what can be called a foster care maintenance payment." (Sen.Rep. No. 96-336, 2d Sess., p. 15 (1980), reprinted in 1980 U.S. Code Cong. & Admin. News, p. 1464.)

under federal law,[2] simply copied verbatim the federal definition of foster care maintenance payments.[3] Thus, California law provides that "[f]oster care providers shall be paid a per child per month rate in return for the care and supervision of the AFDC-FC child placed with them" (Welf. & Inst. Code, § 11460, subd. (a)), and then defines "care and supervision" (*id.*, subd. (b)) precisely as federal law defines "foster care maintenance payments" (42 U.S.C. § 675(4)(A)). Accordingly, " '[c]are and supervision' includes food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, *liability insurance with respect to a child*, and reasonable travel to the child's home for visitation." (Welf. & Inst. Code, § 11460, subd. (b), italics added.)

Corrine argues the language just quoted requires the Bureau to pay for her automobile liability insurance. The argument fails for two reasons. First, Corrine has not sued the agency—the DSS—responsible for setting the basic monthly rate paid to foster care providers. Second, the relevant statutes do not in any event compel the DSS to include automobile liability insurance in the basic monthly rate.

The Legislature has designated the DSS as "the single organizational unit whose duty it shall be to administer a state system for establishing rates in the AFDC-FC program." (Welf. & Inst. Code, § 11460, subd. (a).) The Legislature has also codified the currently established rates. (*Id.*, § 11461 et seq.) The Bureau argues that, because only the DSS can set the basic monthly rate for foster care, the DSS is a necessary party to any action seeking to compel a change in that rate. (See Code Civ. Proc., § 389 [joinder of necessary parties].) Indeed, insofar as Corrine's motion for support services in effect challenges the basic rate, that the DSS is a necessary party appears self-evident. In the absence of the DSS, "complete relief cannot be accorded among those already parties . . . ." (*Id.*, subd. (a).) Furthermore, any judgment invalidating the basic rate would necessarily "impair or impede [the DSS's] ability to protect [its institutional] interest" (*ibid.*) as the agency responsible for setting the rate. Finally, because the court cannot in the absence of the DSS render an effective judgment invalidating the basic rate, the Bureau was

---

[2] (Cf. Welf. & Inst. Code, § 16000.1, subd. (b)(2) ["It is the intent of the Legislature to confirm the state's duty to comply with all requirements under . . . Part E of Title IV of the Social Security Act (42 U.S.C. Sec. 670 et seq.) that are relevant to the protection and welfare of children in foster care."].)

[3] The Legislature first borrowed the federal definition of "foster care maintenance payments" (42 U.S.C. § 675(4)) in 1982 as a definition of the "allowable costs" on which payment rates for group homes or public child care institutions were to be based. (Welf. & Inst. Code, former § 11462, subd. (b)(1), added by Stats. 1982, ch. 977, § 15, p. 3516.) The same language continues today in Welfare and Institutions Code section 11460, subdivision (b).

entitled to raise the claim, as it did, for the first time on appeal. (See *County of Alameda v. State Bd. of Control* (1993) 14 Cal.App.4th 1096, 1105, fn. 5 [18 Cal.Rptr.2d 487].)

Corrine seeks to avoid this conclusion by disclaiming any intention to seek a change in the basic rate and by theorizing that the court may order the Bureau, rather than the state, to pay for her automobile liability insurance. The Bureau, she argues, if ordered to pay may demand reimbursement from the state under Welfare and Institutions Code section 11408.[4] She then concludes: "If this Court rules in Corrine's favor, the same rule (and the same statutory scheme) that requires the county to reimburse foster parents would require [the DSS] to reimburse the [Bureau]." The argument does not advance Corrine's position. It concedes, in effect, that a judicial order interpreting Welfare and Institutions Code section 11460, subdivision (b), as imposing on the Bureau a previously unrecognized financial obligation to foster children ultimately imposes that burden on the DSS and, thus, affects the DSS's ability to carry out its statutory responsibilities. The DSS is a necessary party precisely for this reason. (Cf. *In re Marriage of Lugo* (1985) 170 Cal.App.3d 427, 432–433 [217 Cal.Rptr. 74] [county providing AFDC benefits to a custodial parent is a necessary party to an action seeking to reduce noncustodial parent's child support obligation].)

■ In any event, we do not understand Welfare and Institutions Code section 11460 as requiring the DSS to pay for automobile liability insurance. The section does not authorize direct claims against the state or the counties for particular expenditures by foster children or foster care providers. Instead, the statute directs the DSS *"to administer a state system for establishing rates in the AFDC-FC program."* (*Id.*, subd. (a), italics added.) Federal and state appropriations for foster care are finite and must be shared by all foster care providers in the state. The statute thus necessarily calls upon the DSS to exercise judgment in the use of limited resources. The statutory term "liability insurance" (Welf. & Inst. Code, § 11460, subd. (b); see 42 U.S.C. § 675(4)(A)) might well be sufficiently broad to *permit* the DSS to choose to fund automobile liability insurance for minors in foster care. No such question is before us. The term "liability insurance" is not sufficiently precise, however, in the context of a statute directing a state agency to make the best

---

[4] Welfare and Institutions Code section 11408 provides: "County claims for aid to needy children placed in foster care, as defined by the rules and regulations of the department, shall be filed separately and distinct from other claims and shall be filed for aid furnished by the county at times and in the manner prescribed by the department. Payments for such children may be made subsequent to the furnishing of care and support to needy children in foster care. Payments may be made at the end of each month for the needy children maintained in foster care during the month." We have no occasion to decide, and do not decide, whether Corrine has interpreted this statute correctly.

use of limited funds, to *compel* payment for everything that might conceivably bear that label, any more than the terms "shelter" or "school supplies" (§ 11460, subd. (b)) compel payment for everything that might conceivably bear those labels, however extravagant in the context of a public assistance program.

We review this question of statutory interpretation independently, seeking, as always, to ascertain the Legislature's intent so as to give effect to the law's purpose. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) We begin with the statute's plain language, as the words the Legislature chose to enact are the most reliable indicator of its intent. (*People v. Watson* (2007) 42 Cal.4th 822, 828 [68 Cal.Rptr.3d 769, 171 P.3d 1101].) But if "the text alone does not establish the Legislature's intent clearly, we must turn to other sources for insight, including the provision's statutory context, its legislative history, and 'the human problems the Legislature sought to address' in adopting the juvenile dependency scheme. [Citation.] Dependency provisions 'must be construed with reference to [the] whole system of dependency law, so that all parts may be harmonized.' [Citations.] By examining the dependency scheme as a whole, we can better understand the consequences of a particular interpretation, avoid absurd or unreasonable results, and select the interpretation most consonant with the Legislature's overarching goals." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 844–845 [69 Cal.Rptr.3d 96, 172 P.3d 402].)

Certainly the term "liability insurance" (Welf. & Inst. Code, § 11460, subd. (b); see 42 U.S.C. § 675(4)(A)) is broad enough to include automobile liability insurance for some purposes. "Automobile liability insurance is basically the same as any other form of liability insurance . . . ." (7A Couch on Insurance (3d ed. 2005) § 108:1, p. 108-4.) However, Corrine cites nothing in the history of the relevant state or federal statutes suggesting that Congress or the California Legislature contemplated that foster care maintenance payments would include automobile liability insurance. Nor have the state and federal agencies responsible for interpreting the statutes suggested such a conclusion. The DSS, in its manual of policies and procedures, states without explanation or comment that "the family home basic rate shall be allowed to include the cost of . . . [¶] . . . [¶] . . . [l]iability insurance which covers the child." (Cal. Dept. Social Services, Manual of Policies and Procedures: Operations (2003) ch. 11-400, AFDC-Foster Care Rates, § 11-401.12 [family home basic rates] <http://www.dss.cahwnet.gov/ord/pg312.htm> [as of Jan. 22, 2009].) The federal DHHS appears to have interpreted the term "liability insurance with respect to a child" (42 U.S.C. § 675(4)(A); see Welf. & Inst. Code, § 11460, subd. (b)) as referring to types of coverage that, if unavailable, would

discourage individuals and organizations from becoming foster care providers.[5] On this point, the DHHS explains in its Child Welfare Policy Manual that "[t]he terminology may be misleading, because foster parents are interested in more than 'liability insurance'. The correct interpretation includes coverage of damages to the home or property of the foster parents, as well as liability for harm done by the child to another party.[6] In addition, protection against suit for possible malpractice or situations such as alienation of affection are often realistic concerns of persons who care for the children of others. [¶] Several States have responded to these concerns by providing coverage for foster parents under a 'pooled' liability program which provides in effect a self-insurance for departments of State government.[7] Other States have legislated or otherwise defined foster parents as employees or as persons acting on behalf of the State, thus providing protection to those persons for claims made against them as agents of the State. Some States have purchased insurance coverage for foster parents, although the policies available often do not cover all of the risks incurred." (Admin. for Children & Families, U. S. Dept. of Health and Human Services, Child Welfare Policy Manual (July 14, 2008) § 7.4, par. 3 <http://www.acf.hhs.gov/j2ee/programs/cb/laws_policies/laws/cwpm/index.jsp> [as of Jan. 22, 2009]; see also *id.*, § 8.3B.1, par. 7.)

Consistently with the DHHS's Child Welfare Policy Manual, which recognizes a wide variety of approaches to the problem, the California Legislature has met foster care providers' need for "liability insurance with respect to a child" (Welf. & Inst. Code, § 11460, subd. (b); see 42 U.S.C. § 675(4)(A)) in two specific ways. First, the Legislature has created and funded with appropriations the Foster Family Home and Small Family Home Insurance Fund. (Health & Saf. Code, § 1527 et seq.) "The purpose of the fund is to pay, on behalf of foster family homes and small family homes . . . claims of foster children, their parents, guardians, or guardians ad litem resulting from occurrences peculiar to the foster-care relationship and the provision of foster-care services." (*Id.*, § 1527.1.) Second, the Legislature has prohibited insurers from discriminating against an applicant for homeowner's insurance, which typically covers liability for negligence, on the basis that the applicant provides foster care. (Ins. Code, § 676.7, subd. (a).) The Legislature has also

---

[5] Foster care providers do not need insurance to avoid liability for their wards' driving accidents. They may simply decline to sign their wards' driver's license applications (see Veh. Code, § 17707) and withhold permission to drive (see *id.*, § 17708).

[6] For example, the property damage and liability insurance typically included in homeowner's policies. (Cf. Ins. Code, § 676.7, subds. (a), (b) [barring discrimination against an applicant for homeowner's insurance on the basis that the applicant is engaged in foster home activities, and providing that coverage under such policies with respect to a foster child shall be the same as that provided for a natural child].)

[7] This group of states includes California. (See Health & Saf. Code, § 1527 et seq. [establishing the Foster Family Home and Small Family Home Insurance Fund].)

required insurers to provide coverage "with respect to a foster child [that is] the same as that provided for a natural child." (*Id.*, subd. (b).)

When, as here, no better indication of legislative intent is available, the principle of *ejusdem generis* is helpful. *Ejusdem generis* " 'instructs that "when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope." ' " (*Bernard v. Foley* (2006) 39 Cal.4th 794, 806–807 [47 Cal.Rptr.3d 248, 139 P.3d 1196], quoting *Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1121 [95 Cal.Rptr.2d 514, 997 P.2d 1169].) All of the items mentioned in Welfare and Institutions Code section 11460, subdivision (b)— "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation"—define the broader term " '[c]are and supervision' " (*ibid.*). The list is one of expenditures that are essential to the care and supervision of foster children. Automobile insurance for 17 year olds, while undoubtedly important in some cases, does not fit comfortably into such a list. Many 17 year olds do not drive, for various reasons. For example, some parents or guardians do not allow it, for some driving is too expensive, and for some public transportation makes driving unnecessary. In contrast, for the state to provide those forms of liability insurance necessary to attract and retain foster care providers is arguably essential. Otherwise foster care could not continue.

We need not, as noted, go so far as to conclude that the DSS may not include automobile liability insurance in the basic foster care reimbursement rate. We do, however, conclude that the term "liability insurance" (Welf. & Inst. Code, § 11460, subd. (b); see 42 U.S.C. § 675(4)(A)), is insufficiently precise to compel the DSS to do so. Because the statute imposes no such obligation on the state, or thus on the Bureau, the superior court properly denied Corrine's motion.[8]

---

[8] Corrine also argues the Bureau has independent statutory authority to make supplementary payments for foster care beyond the basic rate established by the state. She refers to Welfare and Institutions Code section 11460, subdivision (e), which provides that "[n]othing shall preclude a county from using a portion of its county funds to increase rates paid to family homes and foster family agencies within that county, and to make payments for specialized care increments, clothing allowances, or infant supplements to homes within that county, solely at that county's expense." Exercising this authority the Bureau has, for example, paid for Corrine's senior class trip, senior prom and high school yearbook. While we may assume the statute would permit a county to pay for a foster child's automobile insurance as a "specialized care increment[]," we see nothing in the statute's permissive language that *compels* a county to do so.

B.  *Did the superior court abuse its discretion by failing to order reimbursement?*

Corrine also argues the superior court had power to order the county to pay for her automobile liability insurance under a variety of statutes defining the courts' powers in dependency cases, and that the court abused its discretion in not doing so. We find no basis for concluding the court abused its discretion.

■ Courts do have broad powers in dependency cases. Under Welfare and Institutions Code section 362, subdivision (a), "[w]hen a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . ." Other statutes guide the court's exercise of this power in specific circumstances. For example, "[i]f the minor is removed from his or her own family, it is the purpose of this chapter [i.e., the Arnold-Kennick Juvenile Court Law; Welf. & Inst. Code, § 200 et seq.] to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. This chapter shall be liberally construed to carry out these purposes." (*Id.*, § 202, subd. (a).) Also, "[e]very child adjudged a dependent child of the juvenile court shall be entitled to participate in age-appropriate extracurricular, enrichment, and social activities. No state or local regulation or policy may prevent, or create barriers to, participation in those activities." (*Id.*, § 362.05.) In such matters, "[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104 [254 Cal.Rptr. 364].)

We may accept as true, if only for the sake of argument, that the cited statutes would permit the court to order the county to pay for a foster child's automobile liability insurance in an appropriate case.[9] Here, however, Corrine made no showing of need sufficiently detailed or specific to distinguish her case from that of any other 17 year old in foster care. She did not assert or make any effort to demonstrate, for example, that she needed to drive to attend school or work. On this meager showing, we cannot say the superior court abused its discretion.

---

[9] Clearly driving is necessary for some foster youths to take advantage of educational or vocational opportunities. For this reason, some counties have chosen to subsidize automobile liability insurance through a different federal-state program, the John H. Chafee Foster Care Independence Program. (42 U.S.C. § 677 et seq.; see also Welf. & Inst. Code, § 10609.3 et seq. [Independent Living Program].) The program is intended to help foster children "make the transition to self-sufficiency" (42 U.S.C. § 677(a)(1)) by providing assistance with such matters as education, vocational training, job placement and daily living skills.

### III. Disposition

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.